[No. 32161. Department Two. February 24, 1953.]

ERNEST R. CRUTCHER, *as Trustee in Bankruptcy, Respondent and Cross-appellant*, v. SCOTT PUBLISHING COMPANY, INC., *Appellant.*[1]

[1]Reported in 253 P. (2d) 925.

*Moulton, Powell, Gess & Loney* and *Gavin, Robinson & Kendrick,* for appellant.

*Thomas Malott,* for respondent and cross-appellant.

HILL, J.—Respondent, trustee in bankruptcy for Mid-Columbia Publishers, Inc., hereinafter referred to as Mid-Columbia, brings this action for the conversion of a newspaper plant and equipment and the consequent destruction of the profitable portion of the then going business of the now bankrupt corporation.

Ralph E. Reed for many years owned and published, in Kennewick, the Courier-Reporter, a weekly newspaper, hereinafter referred to as the Courier, and operated a job printing business in connection therewith. In 1945, Reed entered into a contract to sell the newspaper and the printing business, the plant and all equipment, to E. Earl Allen and Rolfe W. Tuve for twenty-five thousand dollars. Tuve soon thereafter acquired the interest of Allen. The contract provided, *inter alia*, that payments of five hundred dollars and interest were to be made to Reed on June 1, 1945, and "the first day of the first month of each quarter thereafter." It provided, further:

"9. Time is of the essence of this agreement, and in the event that the buyers shall fail to make any of said payments or any part thereof at the times hereinbefore fixed therefor, or shall suffer or permit any of said goods or chattels to be taken from the buyers' possession or removed from 217 Kennewick Avenue, Kennewick, Washington, or shall make default in any of the conditions above stated, or if at any time the seller shall feel insecured, then this contract may be forthwith terminated, at the option of the seller, without notice, and the seller shall thereupon be entitled to the immediate possession of all said property wherever situated. And all payments theretofore made to the seller by the buyers shall be retained by the seller as the seller's own property, as compensation for the use and wear and depreciated value of said goods and chattels, and for the seller's loss and trouble."

In 1948, Tuve and his wife organized the Kennewick Printing Company, Inc., a corporation, and Tuve transferred his interest in all of the property covered by the Reed-Tuve contract to the corporation, including his interest in the contract. (The jury established this point by its answer to a special interrogatory.)

Early in 1949, Tuve and some associates launched a venture which envisioned the acquiring of several weekly newspapers in neighboring communities and the starting of a weekly newspaper in Pasco, with the expectation that it might ultimately become a daily. To implement that project, the articles of incorporation of the Kennewick Printing Company, Inc., were amended, its name being changed to Mid-Columbia Publishers, Inc., and the number of shares of preferred stock being substantially increased.

With all of the Tuve interest in the Reed-Tuve contract vested in Mid-Columbia (formerly the Kennewick Printing Company, Inc.) and all of the personal property covered by that contract in its possession, we come to the critical days of June 11 and 12, 1949. It should be noted that a large linotype machine costing approximately fifteen thousand dollars installed, and certain other equipment which had been acquired subsequent to the Reed-Tuve contract and to which Reed had no claim or title, were in the Kennewick plant.

Mid-Columbia, utilizing the facilities in the Kennewick plant, had begun publication of a newspaper known as the Pasco Empire. This venture proved a heavy drain on the resources of Mid-Columbia, and on Saturday, June 11, 1949, the corporation could not meet the payroll at the Kennewick plant. (Some checks in payment of the two preceding payrolls had been returned "N.S.F." but, on being presented at the bank a second time, had been honored.)

On that date, at a meeting in Pasco of those interested in Mid-Columbia, in which meeting Reed participated, one of the subjects of discussion was the acquisition of Reed's interest in the Courier and the Kennewick plant and equipment. Reed at that time appeared to be concerned chiefly about the fact that the payroll had not been met. He made no demand for the five hundred dollars due by the terms of the contract on June 1st, which had not been paid. (Mrs. Tuve testified that there was an agreement that payments were to be made on the fifteenth instead of the first of the month, and other evidence indicated that payments usually were made after the first and by the fifteenth.) One of the men present

advanced more than one thousand dollars to meet the payroll and Reed apparently was satisfied with that development. He seemed content with a proposal that he meet with the group again to consider some basis upon which Mid-Columbia could acquire his interest in the contract.

Reed testified that, although he indicated at the meeting at Pasco Saturday afternoon certain terms and conditions under which he might be willing to dispose of his interest in the Courier and the printing plant, he made no definite commitments. He testified, further, that after he left the meeting he became so convinced of his insecurity under the contract that he went directly to the Courier office in Kennewick and there told the employees that their checks would come in, and told Mrs. Tuve that he would have to take the business back. He testified, further, that, while he was talking to Mrs. Tuve, Mr. Tuve came in and Mrs. Tuve advised him of what Reed had just told her, and that neither of them voiced any objection or protest. Reed fixes the time of this repossession at about seven p. m. Both Mr. and Mrs. Tuve deny any meeting with him in the Courier office at that time.

Mr. Tuve testified that he did not return to Kennewick following the meeting in Pasco until after ten p. m. Mrs. Tuve testified that she saw Reed's car outside the Courier office at five-thirty or six o'clock that evening and supposed Reed was in it, but that he did not come into the office and she did not talk to him, and that she left the office before six-thirty p. m. and did not return that night. She testified, further, that sometime between eleven and eleven-fifteen that night, Reed called her at home and told her that he had sold the contract to Lee (Glenn C. Lee, one of the officers of the Scott Publishing Co., Inc.).

The jury apparently did not accept the Reed version of the repossession, for in answer to a special interrogatory, it found that he never made a valid repossession of the property described in the Reed-Tuve contract.

Reed testified, further, that about eight-thirty that same evening he called his attorney and asked whether there was anything that would prevent his selling "the shop" and was

advised that there was not. He thereupon contacted Lee and met him at the office of the appellant at about nine or nine-thirty that night. There, without benefit of counsel, Reed and Lee arrived at an agreement and Lee typed the following document, which both parties signed:

"This is a memorandum and agreement between Ralph E. Reed and The Scott Publishing Co Inc.

"Ralph E. Reed is the holder and owner of a Seller's contract to Rolphe Tuve, which contract is in default, because of non payment June 1st, 1949, by Tuve, of the payment and interest due. This contract covers the sale by Reed to Tuve of the Kennewick Courier Reporter and Printing Co.

"By such default, Reed is again in possession by law, as owner of the property.

"Reed desires to sell his ownership in the above mentioned contract to the Scott Publishing Co. Inc. Glenn C. Lee, Sec. Treas. of the Scott Publishing Co, acting for the corporation, has evinced his desire, to buy the contract and Reed's position as it now stands. . . .

"The intent and action on the part of Reed is to sell his interest and ownership in the contract and in the Kennewick Courier Reporter and Printing Co, and the intent and action on the part of Lee, acting for the Scott Publishing Co Inc, is to buy said interest and ownership.

"Therefore by the signing and witnessing of this agreement, Reed sells, and Lee buys, above mentioned interests and ownership."

The purchase price, not mentioned in the typewritten "memorandum and agreement," was fifteen thousand dollars, of which five hundred dollars was paid by Lee that night. (The balance due Reed on the Reed-Tuve contract was $12,150.)

Reed testified that he went directly home after his meeting with Lee, and stayed there.

Several witnesses testified that that same night, about eleven p. m., Reed went to the Courier office and told a group gathered there, including Tuve, who arrived later, that he had sold his interest in the Reed-Tuve contract to Glenn Lee. It is apparent that there is a vast difference between the transaction as those witnesses understood Reed to say it was (*i.e.*, that he had sold his interest in the contract)

and the transaction as Reed and Lee understood it (*i.e.*, that Reed had repossessed the property and sold the repossessed property to Lee).

Early the next morning (Sunday), representatives of the appellant took possession of the Courier office and the printing plant. Locks were thereafter changed on the doors; the windows were barred; a man armed with a shotgun was placed on the premises.

The five-hundred-dollar payment and accrued interest due June 1st by the terms of the Reed-Tuve contract was tendered to both Reed and Lee on June 15th, and was refused. Its principal asset gone, Mid-Columbia was soon in bankruptcy, and the trustee in bankruptcy brought this action for the conversion of the corporation's property and the damages resulting therefrom. The jury brought in a verdict of $22,033 for the trustee in bankruptcy, and the Scott Publishing Co., Inc., appeals. The trustee cross-appeals, contending that an offset of $8,550 against the judgment should not have been allowed.

■ Contrary to appellant's contention, the transfer by Tuve of his interest in all of the property covered by the Reed-Tuve contract to the Kennewick Printing Company, Inc., a corporation, did not have to be evidenced by a writing. The trial court correctly stated the law when it advised the jury that the interest of Tuve in the Reed-Tuve contract could be assigned orally; that any language, however informal, which shows the intention of the owner of a right or interest in property to transfer it, will be sufficient to vest the property in the assignee; and that, in determining whether such an assignment had actually been made, the jury was entitled to take into consideration the actions of the parties with reference thereto, as well as all the circumstances attending the alleged assignment. *Seattle Nat. Bank v. Emmons*, 16 Wash. 585, 48 Pac. 262 (1897); *Morehouse v. Spokane Security Finance Corp.*, 175 Wash. 501, 27 P. (2d) 697 (1933); 4 Am. Jur. 287, 290, Assignments, §§ 74, 77; Restatement, Contracts, § 157. Nor does RCW 65.08.040 (*cf.* Rem. Rev. Stat., § 5827), requiring the recording of bills of

sale, have any bearing on the question. That provision of the section cited is for the benefit of two classes of persons, existing creditors and innocent purchasers. *Morehouse v. Spokane Security Finance Corp., supra.* Appellant was neither.

■ Appellant urges that more than a change of name was involved in the amendment of the articles of incorporation when the corporate name was changed from Kennewick Printing Company, Inc., to Mid-Columbia Publishers, Inc.; that the changes really created a new corporate entity with a new purpose; and that a transfer of assets from the Kennewick Printing Company to Mid-Columbia was necessary.

The only case cited by appellant in its contention is *Midland Co-Op. Wholesale v. Range Co-Op. Oil Ass'n,* 200 Minn. 538, 274 N. W. 624, 111 A. L. R. 1521 (1937), in which the court construed a Minnesota statute and said:

"The statute permitting amendments clearly implies that the amendments should not change the nature or character of the business. . . . The statute does not authorize fundamental changes."

Our own statute on amendments, which is part of the business corporations statute of 1933, provides:

"A corporation at a meeting of the shareholders duly called upon notice of the specific purpose, may amend its articles in any respect so as to include any provision authorized by this title. . . ." RCW 23.12.060; cf. Rem. Rev. Stat. (Sup.), § 3803-37.

As indicated, the only amendments in this case changed the name of the corporation and increased the number of shares of preferred stock. No new corporation was created under our statute. Appellant's assignments of error dealing with this phase of the case are without substance.

That the actions of the appellant in taking possession of the newspaper office and printing plant constituted high-handed seizure of a new Mergenthaler linotype machine and other equipment installed in the Kennewick plant subsequent to the Reed-Tuve contract and to which Reed had no claim, there can be no doubt. Whether or not there was a conversion of the property covered by the Reed-Tuve contract is the primary issue presented on this appeal. There

was such a conversion unless Reed or the appellant had a right to repossess the property and, in furtherance of that right, did repossess it.

The claimed right of repossession is two-fold: (1) the failure to make the payment due June 1st, which it will be noted is the only reason referred to in the agreement between Reed and the appellant for Reed's having repossessed the property, and (2) the fact that the seller (Reed, or the appellant as his assignee) felt insecure.

As to the first, the jury could have found that there was an oral agreement that the payment could be made on the fifteenth rather than the first of the month. Even if there was no such agreement, the jury was entitled to find that the seller, by regularly accepting payments between the first and the fifteenth of the months in which they were due, had, temporarily at least, waived the right to terminate the contract for failure by the purchaser to make the payment on the first day of June.

After such a waiver, in order to reinstate the original terms of the contract, the seller must give notice of his intention thereafter to demand strict compliance with the terms of the contract and must allow the purchaser a reasonable opportunity to comply. In *Lundberg v. Switzer*, 146 Wash. 416, 263 Pac. 178, 59 A. L. R. 131 (1928), we said:

"The appellants cite a long line of cases from this and other courts holding that the right of forfeiture cannot be exercised without demand and a reasonable opportunity to comply after there has been a waiver of strict performance by the acceptance of delayed payments. About this rule there is no controversy, as it is firmly written into the law."

*Cunningham v. Long,* 134 Wash. 433, 235 Pac. 964 (1925); *Beardslee v. North Pac. Finance Corp.,* 161 Wash. 86, 296 Pac. 155 (1931); *Pearson v. Picco,* 181 Wash. 613, 44 P. (2d) 186 (1935); *Franklin v. Gilbert Ice Cream Co.,* 191 Wash. 269, 71 P. (2d) 52 (1937); *Knoblauch v. Sanstrom,* 37 Wn. (2d) 266, 223 P. (2d) 462 (1950); Restatement, Contracts, § 300.

In the present case, the trial judge charged the jury, by instruction No. 14:

"You are instructed that the remedies given to a seller under a conditional sales contract, upon default by the buyer, are for the seller's own benefit and when he knows of such default he may waive the default, either expressly or impliedly. A seller may either expressly or impliedly waive his right to insist upon strict compliance with the terms of said contract. The default of a buyer may be waived by the seller subsequently treating the contract as still in force and such action is a waiver of the right to forfeit the contract. *Such a course of conduct will bar the seller's right to assert a forfeiture for any payment not made at the time stated in the contract unless prior thereto he has given notice to the buyer that he intends to hold him to the original terms and the buyer has had a reasonable opportunity to comply with such notice.* You are instructed that if you find by a fair preponderance of the evidence that the seller had waived the default or defaults, if any, by the buyer he is under the necessity of giving notice to the buyer and a reasonable opportunity for the buyer to cure his default or defaults before forfeiture and repossession can be claimed." (Italics ours.)

Under the facts in this case, instruction No. 14 stated the law with reference to waiver of defaults by a seller and was clearly applicable to the claimed right of repossession based on the failure to make the June 1st payment or on the removal of certain of the property from the premises, and was proper.

Appellant urges that the jury might have concluded therefrom that notice was a requisite to repossession if the seller felt insecure. Repossession on the ground of insecurity was covered by instruction No. 11, which contained no reference to waiver, and there is no reason to suppose that the jury applied instruction No. 14 to the claim of a right to repossession on the basis of insecurity. We find no error in the giving of instruction No. 14.

■ Appellant places greatest reliance upon the proposition that Reed (or the appellant as his successor in interest in the contract) was entitled to take possession of the property covered by the contract because he deemed himself insecure.

The property was not mobile and capable of easy removal; it was not being destroyed, secreted, or moved away. The

seller's security would have been imperiled by a failure to publish the Courier on the following Thursday, in which event the Courier would have lost its status as a legal newspaper and its second-class mailing privilege. However, the payroll problem apparently had been solved for the time being and there was no showing which would enable the court to say that there was, as a matter of law, justification for seizure Sunday morning, June 12, 1949, without giving the contract purchaser an opportunity to demonstrate that the Courier could and would continue to be published.

The instruction given on the right to repossess without notice in the event the seller felt insecure was, we feel, very favorable to the appellant. The jury was told that if the seller acted reasonably and not arbitrarily, and if there existed proper cause to apprehend some loss to his security or if the buyer had committed or was about to commit some act that would tend to impair his security, the seller could, without notice, terminate the contract and take immediate possession of the property.

The jury found, as we have pointed out, that Reed never did repossess the property. It could also have believed that Reed's actions the evening of June 11, 1949, were prompted by a desire to keep the Courier out of the control of Pasco people and to make a profit of almost three thousand dollars, rather than by a feeling of insecurity.

We note an unwarranted assumption by appellant that if there was a conversion it was an ordinary and not a willful conversion. This assumption is based upon a statement in *Glaspey v. Prelusky*, 36 Wn. (2d) 592, 219 P. (2d) 585 (1950). We there discussed one situation that constituted a willful conversion, but did not attempt to give an inclusive definition. We did say that an ordinary conversion is one that is unintentional and inadvertent, which is far from the situation in the present case.

One of appellant's assignments of error is that the trial court should have held that Mid-Columbia had no right or title to the newspaper or the property in the printing plant because in 1946 Tuve secured a three-thousand-dollar loan from one Henry Smith, pledging as security an assign-

ment of his interest in the Reed-Tuve contract. The note and assignment were held in escrow in a Kennewick bank, with instructions whereby the assignment was to be delivered to Smith only if Tuve defaulted in the payments due on the note and Smith deposited with the bank,

". . . a Notice showing Five (5) days notice of his intention to claim default in this agreement and service of the same upon the said Rolfe W. Tuve at Kennewick, Washington, but if such demand is so made, and proof of service of said demand so filed with you [the bank], in [sic] the said payments should not have been made through your bank within five (5) days from the service of said notice, then the provisions of this Agreement shall be executed forthwith, without further notice to any party."

Tuve had not made all the payments required by the note, but prior to the events of June 11 and 12, 1949, Smith had indicated no intention of taking action to enforce his rights. On June 23, 1949, the required five-day notice, signed by Smith, was served on Tuve. Tuve made no payments after the service of the notice, and at the termination of five days the note was canceled and returned to Tuve and the assignment of the Reed-Tuve contract was delivered to Glenn C. Lee, as assignee of all of Smith's interest in the contract, Smith having assigned his interest to Lee by instrument dated June 22, 1949, which recited:

"WHEREAS, the escrow instructions with which said contract and assignment were delivered, have been performed and the pledge of said contract has been foreclosed."

Appellant seeks to set up the title thus secured as a defense to the conversion action.

█ Mid-Columbia's right of action accrued June 12, 1949. Neither Smith nor the appellant had any title at that time by virtue of the assignment. The appellant acquired nothing by virtue of Smith's assignment to Lee (so far as this action is concerned) except the possible right to offset the balance due on the Smith note against the damages for which the appellant was responsible. See *Burnett v. Edw. J. Dunnigan, Inc.*, 165 Wash. 164, 4 P. (2d) 829 (1931); *Helf*

*v. Hansen & Keller Truck Co.*, 167 Wash. 206, 9 P. (2d) 110 (1932). That offset was allowed.

We are convinced that the jury correctly determined that there was a conversion by the appellant; and there was no evidence to support any theory that appellant was merely in possession of property converted by someone else.

This was conversion of a character that rendered the making of a demand unnecessary. As we said in *Hill's Garage v. Rice*, 134 Wash. 101, 107, 234 Pac. 1023 (1925):

"In any event, a demand was unnecessary either for the property or for damages as for its conversion, in view of the defendant's claim of ownership thereof. The defendant's attitude in this controversy from the very beginning absolutely negatives the necessity for a demand. It is conclusively shown that a demand would have been unavailing in view of the defendant's claim of ownership of the property and his defense of this action upon the merits."

See, also, *Richardson v. Great Western Motors*, 109 Wash. 324, 187 Pac. 333 (1920); *Burnett v. Edw. J. Dunnigan, Inc., supra; Kohout v. Brooks*, 185 Wash. 4, 52 P. (2d) 905 (1935).

We now turn to the issues raised as to the amount of the damages.

There is no merit in appellant's contention that the court erred in permitting a trial amendment asking damages for the destruction of a going business. This amendment was made without objection or exception. While it is true that, because of the expansion into the Pasco area, Mid-Columbia was operating at a loss, the jury could have found that the Courier and the job printing business in Kennewick constituted an established and profitable business. We have heretofore recognized that a recovery can be had in a conversion case for damages to an established business. *Seeley v. Peabody*, 139 Wash. 382, 247 Pac. 471 (1926).

We think that a wrongdoer cannot take over the valuable and profitable part of a corporation's business and thereby stop its total operation and then, because the corporation in its total operation was losing money, say there is no liability. The nature of the case is such as the wrongdoer

has chosen to make it. There was evidence that any loss being sustained by Mid-Columbia was not due to lack of profit in the operation of the Kennewick Courier and the job printing business in that city. The market value of that newspaper and the printing business, including the plant and all physical equipment, was set at fifty to fifty-five thousand dollars by one expert witness; Tuve placed a much higher value on it. The jury allowed $27,974 on the equipment taken and $17,000 for the damage and destruction of the business. The verdict was well within the evidence.

Appellant's complaint against an instruction warning the jury against quotient verdicts (and describing them) is without semblance of merit. There was no question of a quotient verdict here. The instruction began, "If you should find that the plaintiff is entitled to a verdict. . . ." It cannot justifiably be said, as asserted by appellant, that such an instruction was an invitation to return a verdict for the plaintiff. The instruction was unnecessary but certainly not prejudicially erroneous.

We are satisfied that, on appellant's appeal, the judgment should be affirmed.

Respondent cross-appeals because the appellant was allowed to set off $8,550 which remained unpaid on the mortgaged Merganthaler linotype machine against the $14,974 found to be the amount of damage for the conversion of the equipment not included in the Reed-Tuve contract.

We think respondent's point is well taken. A person who is entitled to bring an action for a conversion, although he has a limited interest in the property converted, may, as against a stranger, recover the full value of the property. *Hadley Warehouse Co. v. Broughton,* 126 Wash. 356, 218 Pac. 257 (1923); *Burnett v. Edw. J. Dunnigan, Inc., supra; Anstine v. McWilliams,* 24 Wn. (2d) 230, 163 P. (2d) 816 (1945); *Angell v. Lewistown State Bank,* 72 Mont. 345, 232 Pac. 90 (1925); 53 Am. Jur. 907, Trover and Conversion, § 121.

. In *Corey v. Struve*, 170 Cal. 170, 149 Pac. 48 (1915), the supreme court of California said:

"The rule that the owners of a special interest in property may recover only to the extent of such interest applies only to cases where the suit is brought against the owner of the remaining interest or his assignee."

The question of settlement between appellant and the third person who also owns an interest in the property is not before the court. *Messenger v. Murphy*, 33 Wash. 353, 74 Pac. 480.

If appellant wanted credit for $8,550 on the judgment, it had the burden of showing that it had paid that amount or had exonerated Mid-Columbia from all liability therefor; and that appellant failed to do. It was therefore error to offset that amount against the judgment.

It is urged that, while respondent took proper exceptions to that portion of instruction No. 29 which reads:

"If you find for the plaintiff for any sum by reason of alleged conversion of any property not included in the Reed-Tuve contract then plaintiff is entitled to recover the fair cash market value of such property at the date of the alleged conversion thereof, *less any lien indebtedness thereon*," (italics ours)

he did not except to almost identical language in instruction No. 6, and, by reason of his failure to except thereto, the language of instruction No. 6 became the law of the case.

We do not find the same error in instruction No. 6 as in instruction No. 29, because the court said in the former:

"In the event you find any mortgage, pledge, or lien indebtedness existed upon such property *which the defendant has either paid or assumed and agreed to pay* such sum should be deducted therefrom in order to arrive at the net amount of the recovery for the item or items, if any." (Italics ours.)

The element of the appellant's having paid or assumed and agreed to pay the mortgage, pledge, or lien indebtedness was omitted from instruction No. 29.

In any event, under the rule laid down in *Franks v. Department of Labor & Industries*, 35 Wn. (2d) 763, 215

P. (2d) 416 (1950), an adequate exception to one of two or more instructions subject to the same error is sufficient to challenge the consideration of the trial court, which is the purpose of the exception, and to bring the question here for review.

Nor is the argument of appellant that we can add the $8,550 to the judgment only as an alternative to a new trial of any force in a situation such as the present, where the set-off is a liquidated amount. If the set-off was erroneously allowed or erroneously disallowed, judgment would be automatically increased or decreased by the amount thereof. *Richardson v. Great Western Motors,* 109 Wash. 324, 187 Pac. 333.

The judgment is affirmed on the appeal and the case is remanded on cross-appeal, with instructions to increase the judgment by $8,550.

SCHWELLENBACH, HAMLEY, FINLEY, and OLSON, JJ., concur.

April 7, 1953. Petition for rehearing denied.