[No. 27177-6-I.   Division One.   May 26, 1992.]

SEATTLE-FIRST NATIONAL BANK, *Appellant,* v. WESTWOOD LUMBER, INC., ET AL, *Respondents.*

812

*Bruce E.H. Johnson* and *Davis Wright Tremaine,* for appellant.

*Chris R. Youtz, Edward Gallagher,* and *Sirianni & Youtz,* for respondents.

SCHOLFIELD, J. — Seattle-First National Bank (Sea-First) brought this action against Westwood Lumber, Inc. (Westwood), and Steven and Pamela Yonich (the Yoniches) to enforce a guaranty agreement. From a judgment in favor of the Yoniches, Sea-First appeals. We reverse.

FACTS

The Yoniches were the owners of Westwood, a former wood brokerage business in Aberdeen, Washington. In 1982, Westwood entered into a borrowing relationship with Sea-First, in which it pledged its accounts receivable to secure a line of credit which ultimately grew to $1 million. *See Seattle-First Nat'l Bank v. Westwood Lumber, Inc.,* 59 Wn. App. 344, 345, 796 P.2d 790 (1990), *review denied,* 116 Wn.2d 1003 (1991).[1] The Yoniches acted as sureties for amounts loaned by Sea-First to Westwood pursuant to a guaranty agreement dated November 8, 1982. This case concerns the Yoniches' liability to Sea-First for Westwood's debts under the guaranty agreement.

When it first entered into its borrowing arrangement with Sea-First in 1982, Westwood pledged all its accounts receivable and was permitted to borrow up to 75 percent of its eligible receivables,[2] not to exceed the limit of the line of credit. The initial credit limit was $250,000. This amount increased to $400,000 and later to $1 million, where it remained until the line of credit was terminated on November 14, 1984.

---

[1]Although different issues were addressed in the earlier *Westwood* opinion, it involved the same general parties and provides a good summary of the factual background.

[2]Only certain receivables were eligible to be included in the borrowing base. Receivables not eligible to be included in the base were those from any other company owned by the Yoniches and those over 60 days old at the time of borrowing.

The Sea-First banker with whom Westwood initially dealt was Doug Guinn. Guinn understood Westwood's business and was thoroughly familiar with the lumber activities of the Aberdeen area. In March 1984, in anticipation of increased business generally and a large contract with A.G. Spanos Company (which later did materialize), Westwood sought an increase in its line of credit to $2 million. The Yoniches submitted an application for this increase to Sea-First through Guinn.

Guinn was enthusiastic about the prospects for the increased line of credit and anticipated that it would be granted. When Guinn left the Aberdeen Sea-First branch in June 1984, he told the Yoniches: " 'I've got you covered' ", referring to the increase to a $2 million line of credit. Also before his departure, Guinn had the Yoniches sign a master note and a new guaranty agreement, both in blank, advising them that it would be filled in when Sea-First's regional office formally approved the increase in their line of credit. Although the Yoniches realized that no increase in their line of credit would be effective until approved by Guinn's superiors, the statements made by Guinn made them hopeful that such approval would be granted.

Guinn and the branch manager left Sea-First in the early summer of 1984. Jerry Miller, who eventually became Westwood's new loan officer, apparently was not knowledgeable about the lumber brokerage business, and neither was the new branch manager, Terry Daughters.

At its inception, the operating arrangement between Westwood and Sea-First had been as follows: In 1982 and 1983, the Yoniches, acting on behalf of Westwood, signed 1-year "master" promissory notes. While these master notes, as well as those signed in 1984, required payment in full on demand or at maturity, the bank never required full payment and Westwood never paid the full balance owing. Instead, the course of dealing between the parties was to routinely issue a new master note to cover Westwood's borrowing after the expiration of the old note.

Upon the expiration of Westwood's yearly master note on June 30, 1984, Sea-First continued to permit borrowing even though Westwood did not pay the full balance owing. This continued until a new master note was executed on August 9, 1984, which was the first time Sea-First had Westwood execute a 30-day master note rather than a yearly master note. The Yoniches were told that an annual note would be executed after the bank had completed the approval process and paperwork on their new $2 million line of credit.

Thirty-day master notes were again executed on September 11 and October 15, and had maturity dates of October 11 and November 14, respectively. Each of these notes stated that it was payable on the earlier of demand or the maturity date.

Sea-First's Aberdeen manager, Terry Daughters, met with the Yoniches on November 8, 1984. At that meeting, Daughters advised the Yoniches that Westwood's application to increase its line of credit to $2 million had not yet been approved. Daughters informed the Yoniches that they and Westwood must agree to new conditions to continue the line of credit at the existing $1 million level. This was the first time that the Yoniches had been told of the new conditions. They were not told that their request for an increase in the line of credit to $2 million had been denied.

Daughters also presented Mr. Yonich with U.C.C. financing statements on all the inventory owned by Westwood Shake and Shingle, Inc. (Shingle), a wholly owned subsidiary of Westwood. Shingle had an existing $250,000 line of credit with Rainier National Bank and its inventory was already 100 percent committed as collateral for that financing.

The conditions presented by Daughters were both written and verbal. Some of the oral demands were conditions which could have been met by the Yoniches and to which they had no serious objection. Some of the other conditions could not have been met. Others were unclear and confusing. For example, it was unclear who was to be in a superior secured

creditor status for the Shingle inventory — Sea-First or Rainier. Moreover, the Yoniches were uncertain of their ability to comply with Sea-First's requirement that they transfer to Sea-First the banking for corporations that they did not control. Nonetheless, the Yoniches were informed by Daughters that the bank required compliance with all conditions. If the Yoniches accepted the conditions, the bank agreed to provide Westwood with credit at a limit of $1 million for a 90-day period at prime plus 2 percent. Sea-First did not demand payment of the balance owing on either the master note or the computer note[3] as a condition of continuing financing.

In accordance with the October 15, 1984, master note, Westwood received its last advance in the amount of $40,000 on November 13, 1984. Including that amount, the total principal owed by Westwood as of that date was $940,505.71.

Westwood would not accept the new conditions put forth by Sea-First. However, soon after November 14, Westwood prepared a new borrowing certificate and sought an advance pursuant to that certificate. The bank refused to advance any more money, and no further advances were made after November 14, 1984. The trial court found that the basis of the bank's refusal to loan was the failure of the Yoniches and Westwood to agree to provide more collateral.

Thereafter, nearly all money deposited in Westwood's account from receivables was credited to the master note.[4] Monthly operating expenses of Westwood of approximately $50,000 continued while financing was sought elsewhere. Although reasonable efforts were made, Westwood was not

---

[3]In August 1984, Sea-First loaned Westwood $24,540 for the purchase of a computer to update its accounting system. Payments on the computer loan were automatically deducted from Westwood's account by the bank. This note is referred to as the "computer" note.

[4]The balance owing on the master note was reduced from $940,505.71 on November 14, 1984, to $361,153.23 in April 1985, with interest through February 16, 1988, of $108,436.62. The computer note principal owing was $22,926.09 with interest through February 16, 1988, of $7,835.82.

successful in obtaining alternative financing. The only exception was the A.G. Spanos contract, which was financed by Rainier Bank through Shingle.

Sea-First filed this action against Westwood and the Yoniches in May 1985, seeking to recover approximately $385,000, plus interest, on the promissory notes executed by Westwood in favor of Sea-First.[5] In July 1985, Westwood filed for relief under chapter 11 of the federal bankruptcy code, 11 U.S.C. § 362. *See Seattle-First Nat'l Bank v. Westwood Lumber, Inc.*, 59 Wn. App. 344, 346, 796 P.2d 790 (1990), *review denied*, 116 Wn.2d 1003 (1991). These proceedings were later converted into liquidation proceedings under chapter 7. *Westwood*, 59 Wn. App. at 346.

Trial of Sea-First's claim against Westwood was stayed under the automatic stay provisions of 11 U.S.C. § 362. However, the bank's action against the Yoniches as sureties was tried to the court in July 1988. *Westwood*, 59 Wn. App. at 346. The trial court found that there was a debt due from Westwood to Sea-First in an amount of $382,000 plus interest, but generally held that the Yoniches were discharged from their guaranty because of Sea-First's failure to provide reasonable notice before termination of Westwood's financing. *Westwood*, 59 Wn. App. at 346. Sea-First's claims against the Yoniches were dismissed with prejudice, and the Yoniches were granted $45,754.20 in attorney's fees.

In this appeal, Sea-First assigns error to several of the trial court's findings of fact. Many of these findings arise from the court's threshold determination that the parties' "course of dealing" established and became the agreement between them, thus overriding the clear terms of the promissory notes. Error is further assigned to several findings that the Yoniches relied on representations of the bank to their detriment. These and other alleged errors in the factual findings will be addressed in the body of the opinion.

Sea-First has also assigned error to many of the trial court's conclusions of law. The findings and conclusions,

---

[5] The amount owing on the master note was approximately $362,000, and the amount owing on the computer note was $23,000.

Sea-First contends, are directly contrary to the Washington Supreme Court's recent decision in *Badgett v. Security State Bank*, 116 Wn.2d 563, 807 P.2d 356 (1991).

## COURSE OF DEALING

Sea-First argues that the written contract between the parties cannot be modified by reliance on principles of "good faith" or "course of dealing". Sea-First contends that the trial court erred in refusing to enforce the Westwood promissory note as written. The Yoniches claim that their agreement with the bank was not limited to the terms appearing on the face of the promissory notes, but also included oral understandings, borrowing certificates and other documents, and a course of dealing between the parties.

While this appeal was pending, the Washington State Supreme Court decided *Badgett v. Security State Bank, supra*, a case which we view as dispositive of many of the issues raised in this appeal. The borrowers in that case, the Badgetts, were dairy farmers who borrowed from the bank to finance their dairy operation. *Badgett*, at 565. After deciding to leave their dairy business and participate in the Dairy Termination Program (DTP), the Badgetts approached the bank with a proposal for restructuring their $1.5 million debt. *Badgett*, at 566. The Badgetts met with their loan officer to discuss the various options, and their loan officer later presented their proposal to the bank's loan committee. However, the committee did not accept the Badgetts' proposal. *Badgett*, at 566-67. When the Badgetts' bid for DTP participation was subsequently rejected, they stopped making payments on their loan to the bank. The Badgetts then brought a suit for damages against the bank, claiming that it had unreasonably refused them permission to participate in the DTP. *Badgett*, at 567.

The trial court dismissed the Badgetts' claims, ruling that the bank was under no duty to negotiate and that a prior course of conduct could not create a new obligation on the bank's behalf. *Badgett*, at 567-68. The Court of Appeals

reversed, holding that there was enough evidence that the parties' course of dealing had created a good faith obligation on the bank's behalf to consider the Badgetts' proposals. The Washington Supreme Court accepted review, reversed the Court of Appeals, and reinstated the trial court's judgment. *Badgett*, 116 Wn.2d at 565.

Although the court acknowledged the existence in every contract of an implied duty of good faith and fair dealing, it held that such a duty does not extend to obligate a party to accept a material change in the terms of his or her contract. *Badgett*, 116 Wn.2d at 569. The court further held that the duty of good faith does not add substantive terms to the parties' contract. Instead,

it requires only that the parties perform in good faith the obligations imposed by their agreement. Thus, the duty arises only in connection with terms agreed to by the parties.
. . . The duty to cooperate exists only in relation to performance of a specific contract term. As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms.

(Footnote and citations omitted.) *Badgett*, at 569-70. The court ruled that the Badgetts had received the full benefit of their contract when they received the amount of money they bargained for at the agreed rate of interest for the agreed period of time. *Badgett*, at 570.

The court also rejected the Badgetts' claim that because the bank had anticipated changes in their financial situation and had been flexible in dealing with them in the past, the parties' course of dealing had created a good faith obligation on the part of the bank to consider the Badgetts' proposals. *Badgett*, at 572. The court held that a course of dealing does not override express terms of a contract or add additional obligations, but rather, is a tool for interpreting the provisions of a contract. *Badgett*, at 572. If an agreement and an applicable course of dealing are inconsistent with one another, the court held, then the express terms control. *See Badgett*, at 573.

██ In the present case, the writings that evidenced the agreement between the parties consisted of promissory notes, the general guaranty, and various security agreements. The trial court ruled, however, that the parties' agreement was not governed by these writings:

18. While these master notes, as well as those signed in 1984, on their face required payment in full on demand or at maturity, the Bank, in fact, never required payment and Lumber never paid the full balance owing. Instead, the course of dealing between the parties was to routinely issue a new master note to cover Lumber's borrowing after expiration of the old note. *This course of dealing, in fact, established and became the agreement between the parties and the court so finds.*

(Italics ours.) Finding of fact 18, in part. The above "finding" serves as the foundation of much of the trial court's decision. Although listed as a finding of fact, we regard the italicized portion as a conclusion of law and will treat it as such. *See Town Concrete Pipe of Wash., Inc. v. Redford,* 43 Wn. App. 493, 502, 717 P.2d 1384 (1986) (findings of fact that are conclusions of law are treated as conclusions of law). The court essentially concluded that a course of dealing may override the express terms of a written agreement between parties to a contract. This determination cannot be reconciled with the *Badgett* court's holding that "a course of dealing does not override express terms in a contract or add additional obligations." *Badgett,* at 572. Therefore, we reject the trial court's ruling that the parties' course of dealing established and became their agreement.

GOOD FAITH, ESTOPPEL, AND WAIVER

Regarding the bank's right to demand additional collateral and enforce the note according to its terms, the trial court entered a series of findings and conclusions to which Sea-First assigns error. To summarize, the court determined that Sea-First's request for additional collateral amounted to an unreasonable attempt to change the "course of dealing" agreement between the parties. The court also concluded that the bank's duty of good faith required it to

provide Westwood with reasonable notice prior to the withdrawal of financing, and further obligated it to provide Westwood with interim financing while it sought funding elsewhere. The court ruled that the bank was equitably estopped from enforcing the notes on demand without notice. Finally, the court determined that the bank, through a "course of dealing" and certain representations to the Yoniches, intended to "waive" the demand character of the notes. Each of these bases for the court's decision is discussed below.

1. Request for Additional Collateral.

The security agreement between the parties provided that the secured party, *i.e.*, Sea-First, had the right to determine the percentage of eligible accounts which the loan balance could not exceed. During the course of their relationship, Westwood and Sea-First had a policy that Westwood could borrow up to 75 percent of its eligible receivables, not to exceed the limit of its line of credit.

█ The trial court apparently concluded that this "course of dealing" became a binding agreement between the parties, and that when Sea-First notified the Yoniches of its demand for additional collateral at the November 8, 1984, meeting, it violated this agreement in a fashion that was unjustified and unreasonable. Conclusions of law 5, 6, 9. We disagree. The bank was entitled to determine the extent of the collateral necessary to secure any new loan to Westwood.[6] Under the *Badgett v. Security State Bank*, 116 Wn.2d 563, 807 P.2d 356 (1991) holding, the fact that the parties had previously followed a course of dealing whereby the bank loan would not exceed 75 percent of eligible receivables does not bind the bank to follow that pattern. The bank was within its rights to demand additional collateral

---

[6] It should be noted here that the bank was not seeking additional collateral to secure amounts loaned under the existing note, effective October 15 to November 15, 1984. Rather, it was seeking additional collateral as a condition for renewal of the loan arrangement. See finding of fact 32. As will be discussed later, we believe that the good faith limitations of RCW 62A.1-208 are applicable only where additional collateral is sought to secure *existing* indebtedness.

from the Yoniches as a condition of any new financing agreement.

2. Duty of Good Faith.

The trial court here correctly determined that the bank was required to abide by the general duty of good faith inherent in every contract. However, the court also concluded that the bank was bound by the good faith duties of RCW 62A.1-208 and that it breached that duty. We disagree.

■ The good faith duties of RCW 62A.1-208 apply only when a party seeks to accelerate payment or performance or requires additional collateral. The provision indicates that the party shall have the power to take such steps "only if he in good faith believes that the prospect of payment or performance is impaired." RCW 62A.1-208. In this case, Sea-First did not seek to accelerate payment. While it did demand additional collateral, the collateral was not sought as additional security for the existing indebtedness, but rather, was a condition for *renewal* of the promissory note. We do not view such a request as being governed by the good faith limitations of RCW 62A.1-208. Under such circumstances, it is irrelevant whether Sea-First "did not believe in good faith that the prospect of payment or performance was impaired." Conclusion of law 6. The duty of good faith under RCW 62A.1-208 does not limit the bank's right to demand additional collateral to secure funds to be loaned under a new and independent agreement.

■ ■ Sea-First's general duty of good faith under RCW 62A.1-203 existed only in connection with the terms of its agreement with Westwood and the Yoniches. *Badgett*, at 569. As a matter of law, Sea-First did not breach this duty simply by enforcing the note according to its terms. *See Badgett*, at 570. The note on its face provided that it was due on demand or by November 14, 1984. There is no provision for any additional notice that the line of credit may not be renewed. Nor is there any term governing interim financing. As the court noted in *Allied Sheet Metal Fabricators, Inc. v.*

*Peoples Nat'l Bank*, 10 Wn. App. 530, 518 P.2d 734 (1974), *cert. denied*, 419 U.S. 967, 42 L. Ed. 2d 183, 95 S. Ct. 231 (1974), a history of providing financing does not create a duty to provide future financing:

> The continuing practice of financing does not change the rights of the parties under written notes and written security agreements. The parties did not have an agreement for continuing financing with an agreement calling for notice either orally or in writing. They had a practice of executing continued demand notes. Demand notes with the security agreements here executed indeed put the bank in a position where if it takes action, as a practical matter, the company is in trouble because it has lost its financing, but that is the agreement that the parties made by appropriate written instruments.
>
> The plaintiffs indicate that the question is, does the bank have a right to call in these notes and offset these accounts without notice. The legal answer is yes, because they are demand notes, because that is the contract that the parties made.

*Allied Sheet Metal*, at 533-34 (quoting trial court ruling).

The trial court erred in imposing additional duties on Sea-First by virtue of a "course of dealing". Because Sea-First simply enforced the express terms of the promissory note in this case, its actions did not constitute bad faith.

3. Equitable Estoppel.

The promissory note dated October 15, 1984, unambiguously provides that it is "payable on demand, but if no demand is made on November 14, 1984". However, the Yoniches claim, and the trial court agreed, that Sea-First was estopped from seeking payment from them on demand and without reasonable notice. Conclusion of law 13.

■ The elements of an equitable estoppel are (1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reliance upon that act, statement, or admission; and (3) injury to the relying party from allowing the first party to contradict or repudiate the prior act, statement, or admission. *Schoneman v. Wilson*, 56 Wn. App. 776, 783, 785 P.2d 845 (1990). Implicit in these

factors is that the assertion on which an estoppel is based must induce detrimental reliance by the other party. *Schoneman*, at 784. Such reliance, in turn, must be reasonable. *Schoneman*, at 784.

We believe that the Yoniches have failed to show a statement or action on the bank's behalf that was inconsistent with its later claim to enforce the terms of the promissory note. The only findings tending to support any inconsistency are (1) the finding that Westwood's former loan officer, Guinn, told the Yoniches in June 1984 that "'I've got you covered'", referring to the increase to a $2 million line of credit (finding of fact 12); (2) the bank's representations to the Yoniches that the 30-day notes were being executed only because the paperwork on their increased line of credit had not yet been completed (finding of fact 21); and (3) the finding stating that the bank had led Westwood to reasonably believe that it had a secure financing agreement with it (finding of fact 49).

■ Guinn's statements to the Yoniches about having them "covered" did not rise to the level of a promise or assurance of future financing. A similar claim was rejected by the court in *State Bank v. Curry*, 190 Mich. App. 616, 476 N.W.2d 635 (1991). That case involved a dairy farmer who had obtained operating loans from the bank to finance its operations. After deciding to leave the dairy business and participate in a government buyout program, the defendant, Curry, went to the bank to discuss the issue with his loan officer. *Curry*, at 618. He asked his loan officer, "'Are you with me or against me?'", to which his loan officer replied, "'We're with you.'" *Curry*, at 618. When the bank subsequently refused to grant the necessary loan, the Currys defaulted on the promissory note, resulting in the bank's filing an action for claim and delivery. *Curry*, at 619. The Currys counterclaimed under several theories, including promissory estoppel. *Curry*, at 619. A jury returned a judgment in favor of the Currys.

The bank argued on appeal that, even assuming the Currys were told that the bank was "with" them or would "support"

them, these representations did not amount to a definite and clear promise to issue a loan. The court agreed:

> [T]here was no evidence of the exact nature of the "support" the Currys felt they would be given and, indeed, no evidence of a promise to extend a loan. . . . While it is not difficult to understand how the Currys may have felt the "support" they believed they were assured of meant the approval of their loan application, there was no clear and definite promise of a loan sufficient to warrant their subsequent purchases and actions and, consequently, insufficient evidence to establish their theory of promissory estoppel.

*Curry*, at 620-21. We agree with the *Curry* court's analysis. Under the present facts, Guinn's statement to the Yoniches that " 'I've got you covered' " did not amount to a promise or representation to be relied upon.

Nor do we believe the Yoniches were misled by the bank's statements that 30-day notes were being used because the paperwork for the increased loan amount had not been completed. Standing alone, such a statement does not amount to an assurance that a future loan would be approved. At no time did the bank assure the Yoniches that Westwood would receive continuing financing, and no agreement or commitment to provide such financing was ever entered. The trial court specifically found that the Yoniches "realized that no increase in their line of credit would be effective until approved by Mr. Guinn's superiors *although they were hopeful* that such approval would be given from the statements made by Mr. Guinn." (Italics ours.) Finding of fact 12. This finding by itself negates any inference that the Yoniches were justified in relying on Guinn's statement.

To the extent that the Yoniches relied on the bank's actions in not seeking any alternate financing, their reliance was not reasonable. Because the note explicitly stated that it was due on demand or on November 14, 1984, the Yoniches were given reasonable notice that the bank may require payment on the latter date.

4. Waiver.

Based on the parties' "course of dealing", the "representations" made by Sea-First to the Yoniches, and the bank's

apparent willingness to continue financing for 90 days after the note's November 14 termination date, the trial court found that Sea-First had intended to waive its right to immediate payment of the master note either on demand or on its termination date. Finding of fact 44.

A waiver is generally defined as the voluntary relinquishment of a known right. *Sherman v. Lunsford*, 44 Wn. App. 858, 862-63, 723 P.2d 1176 (1986); Restatement (Second) of Contracts § 84, comment *b* (1981). Although a waiver of contractual rights can occur through a course of performance,[7] the bank did not waive its right to enforce the note according to its terms in this case.

The trial court's "course of dealing" theory is that because the bank had previously allowed the master notes to expire without demanding payment, it had waived its right to demand timely payment on the last note. However, the note provided that if payment was not made when due, "then at the option of the holder of the Note, the Principal Balance and all unpaid interest *may* be declared immediately due and payable". The note's terms clearly contemplated that, on default, the holder could *either* forgo collection or demand immediate payment. We do not view the holder's choice of one option as a waiver of the other.

Furthermore, the promissory notes here represented individual and distinct contracts. Even if it could be said that the bank had waived its demand to collect under its previous contracts, this does not translate into an automatic waiver of the same right when a new contract is negotiated.

---

[7]*See* Restatement (Second) of Contracts § 150, comment *e* (1981) (waiver may be found in course of performance). *Badgett v. Security State Bank*, 116 Wn.2d 563, 807 P.2d 356 (1991) does not address the waiver issue, but states only that a course of dealing does not "override express terms" or "add additional obligations." *Badgett*, at 572. A waiver theoretically does not alter or modify an agreement since the item waived may be reinstated on reasonable notice. *See* Restatement (Second) of Contracts § 150, comment *c* (1981).

The bank's "representations" to the Yoniches have been previously discussed in the context of the estoppel issue. These statements did not amount to a waiver. Finally, although the bank did offer to extend financing for another 90 days, we do not see how this evidenced an intent by the bank to waive its rights under the promissory note. This offer was made as a part of a new proposed loan agreement with different terms. The Yoniches did not agree to the new terms, and the bank therefore refused to lend additional funds after November 14, 1984.

### ATTORNEY'S FEES

The guaranty agreement between the parties contains the following attorney's fee provision:

> Guarantor agrees to pay a reasonable attorneys' fee and all other costs and expenses which Bank may incur in enforcing or defending this agreement, whether or not a lawsuit is started.

Pursuant to this provision, the trial court awarded the Yoniches $45,754.20 in attorney's fees at trial. As we conclude that the trial court's decision must be reversed, the award of attorney's fees to the Yoniches must also be reversed. Further, pursuant to the attorney's fee clause in the guaranty provision, we grant Sea-First its attorney's fees both at trial and in this appeal. See RAP 18.1(a).

Judgment reversed.

PEKELIS and KENNEDY, JJ., concur.

Review denied at 120 Wn.2d 1010 (1992).