247 P.3d 790 (2011)
CORNERSTONE EQUIPMENT LEASING, INC., a Washington corporation, Respondent,
v.
Ray MacLEOD, an individual, Appellant.
No. 64342-8-I.
Court of Appeals of Washington, Division 1.
February 7, 2011.
*792 Oscar Yale Lewis Jr., Kara Herschkowitz, Hendricks & Lewis PLLC, Seattle, WA, for Appellant.
Paul Dayton, Attorney at Law, Seattle, WA, for Respondent.
BECKER, J.
¶ 1 This is a dispute about whether a promissory note is enforceable. Appellant signed the note but claims the creditor assured him the note was strictly for "internal purposes" and later told him he had paid enough and they were "even." We affirm the order granting summary judgment to the creditor. The debtor had no right to rely on the alleged oral assurance that contradicted the written obligation, and in any event, he failed to show evidence of harm suffered in reliance on the alleged promise that the note would not be enforced.
¶ 2 We review summary judgment de novo. Hubbard v. Spokane County, 146 Wash.2d 699, 706-07, 50 P.3d 602 (2002). We engage in the same inquiry as the trial court. Hubbard, 146 Wash.2d at 707, 50 P.3d 602. The moving party will receive judgment as a matter of law if there are no issues of material fact. CR 56(c). When reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law. Michelsen v. Boeing Co., 63 Wash.App. 917, 920, 826 P.2d 214 (1991). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. Hubbard, 146 Wash.2d at 707, 50 P.3d 602.
¶ 3 Cornerstone Equipment Leasing, Inc., was in the business of lending money to other business ventures, primarily through its president, James Chevigny. Appellant *793 Ray MacLeod, a business developer and investor, pursued a number of business opportunities with Chevigny beginning in 1997.
¶ 4 In 1998, MacLeod loaned $1,450,000 to the Oneida Tribe. To do this, he borrowed $725,000 from Cornerstone. MacLeod signed a promissory note in favor of Cornerstone on July 15, 1998. Interest was to accrue at an annual rate of 20 percent, and payments were required each month. Full payment was due on November 7, 1999.
¶ 5 For a time, MacLeod made regular payments. In December 1999, he and Chevigny memorialized an agreement to extend the payment date by 24 months.
¶ 6 By the end of 2001, the balance due on the note was approximately $140,000. Chevigny asked MacLeod to sign another extension on the note. MacLeod protested that he had already paid more than he had borrowed from Cornerstone. According to MacLeod, he and Chevigny made an oral agreement to set aside the remaining principal amount owed with the understanding that it would be used in a future business venture, and in the meantime, MacLeod would make payments of interest only on that amount. In December 2001, they signed a loan modification agreement extending the due date for a period of 24 months. For the next two years, MacLeod made payments irregularly and in varying amounts.
¶ 7 In 2004, MacLeod and Chevigny negotiated new terms for the balance of the loan. MacLeod signed another amended note. He agreed to pay a principal sum of $139,608.20. Amounts due were payable no later than June 30, 2005.
¶ 8 At the end of June 2005, MacLeod signed yet another amended note. This note is the foundation for the present action. It stated a principal sum of $121,608.20 and provided for compound interest. All amounts due were to be paid in full no later than April 1, 2006. In the meantime, MacLeod was to pay $5,000 per month. The note bears a statement, in boldface underlined capital letters just above MacLeod's signature, that oral agreements to forbear from enforcing repayment of a debt are not enforceable under Washington law.
¶ 9 MacLeod claims Chevigny assured him the note was just "paperwork" that would be used only for "internal purposes" and they would work out the dispute about the note in connection with some "future deal" yet to be made. MacLeod made some payments on the note in 2006, but he says he did so only to help Chevigny appease his partners who were unhappy about the note not being paid. His last payment was $3,000 in July 2006. According to MacLeod, Chevigny called him in December 2006 and told him they were "even." Chevigny denies making these representations to MacLeod but concedes MacLeod's account must be taken as true for purposes of summary judgment.
¶ 10 MacLeod and Chevigny did not talk again until June 2007 when Chevigny called MacLeod and demanded payment. When MacLeod refused, Chevigny followed up with a letter to MacLeod demanding payment. Chevigny stated the amount owed and invited MacLeod to contact him with a plan to pay off the balance in full. Five months later, in November 2007, MacLeod received a debt collection letter from Cornerstone's attorney demanding payment on the note. He did not pay. Cornerstone filed suit. After granting summary judgment to Cornerstone, the trial court entered judgment against MacLeod for sums due on the note and prevailing party attorney fees, for a total of $331,288.96.
¶ 11 MacLeod appeals the grant of summary judgment. MacLeod does not dispute that he breached the terms of the note. He contends he raised genuine issues of material fact with respect to his affirmative defenses of fraudulent misrepresentation, estoppel, and waiver.

FRAUDULENT MISREPRESENTATION
¶ 12 MacLeod contends Chevigny fraudulently induced him to sign the 2005 note. He supports this claim with his declaration that Chevigny represented the note as for "internal purposes" only, to alleviate the concerns of Chevigny's partners:
49. . . . Mr. Chevigny asked me to sign yet another amended note ("2005 Amended Note"). I refused to sign another extension, *794 as I had paid them well over $930,000, and because we had not closed any further deals, which Mr. Chevigny had assured me was the reason for extending the note in the first place.
50. Mr. Chevigny told me that he needed some kind of paperwork because his partners were giving him a hard time, and so he again asked me to sign the note and make just a few payments, which he explained were for "internal purposes only." Mr. Chevigny said that the 2005 Amended Note was simply to make his partners happy and that we would work the dispute out in a future deal.
51. I relied upon Mr. Chevigny's assurance on this matter and signed the 2005 Amended Oneida Note on June 23, 2005.
In a deposition, MacLeod said he signed the note "as a business friend with Jim, who had been having problems with his partners because of the amount of the money owed." He described the event "as a gentleman's agreement with Jim, to help him out at his end."
¶ 13 Fraudulent misrepresentation requires proof by clear, cogent, and convincing evidence of the nine elements of fraud. One of the elements is the plaintiff's right to rely upon the truth of the representation. Westby v. Gorsuch, 112 Wash.App. 558, 570, 50 P.3d 284 (2002), review denied, 149 Wash.2d 1008, 67 P.3d 1097 (2003). Cornerstone contends that a promisee cannot establish a right to rely on statements that are inconsistent with a written agreement made contemporaneously.
¶ 14 While justifiable reliance is normally a question of fact, summary judgment is appropriate if reasonable minds could reach but one conclusion. Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 181, 876 P.2d 435 (1994). As a general rule, a party has no right to rely on an oral representation that contradicts unequivocal written evidence that demonstrates the falsity of the alleged representation. See Lawyers Title Ins. Corp. v. Baik, 147 Wash.2d 536, 553-54, 55 P.3d 619 (2002).
¶ 15 Consistent with Baik is a federal case cited by Cornerstone, Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage, Investments, 951 F.2d 1399, 1412 (3rd Cir. 1991). In that case, Mellon Bank attempted to rely on oral promises that directly contradicted its written agreements with another party. Mellon Bank, 951 F.2d at 1412. Under the circumstances, where the agreements at issue were between sophisticated businessmen, Mellon Bank could not justifiably rely on a "gentlemen's agreement." Mellon Bank, 951 F.2d at 1412.
¶ 16 MacLeod attempts to distinguish his case from Mellon Bank on three grounds. Mellon Bank was a major banking institution while MacLeod is merely an individual who dealt directly with Chevigny, Cornerstone's president; Mellon Bank consulted with counsel while MacLeod did not; and MacLeod and Chevigny established an informal course of dealing that frequently involved toleration by Chevigny of partial and inconsistent performance by MacLeod. These facts, however, did not make it reasonable for MacLeod to rely on Chevigny's alleged representations as a basis for ceasing to make the payments due. It is patently unreasonable to freely sign a document acknowledging a debt based on an oral assurance that the document is meant for "internal purposes" only. Like in Mellon Bank, MacLeod is an experienced business person and he could have retained counsel. The fact that Chevigny was the major officer of his company did not justify MacLeod in relying on his oral representations where they directly contradicted the written terms of the loan. To allow avoidance of the debt under these circumstances would affront the law of contracts and destabilize business transactions.
¶ 17 We conclude MacLeod's defense of fraudulent misrepresentation fails because as a matter of law, he had no right to rely on an alleged oral promise not to enforce a contemporaneous written agreement. Whether MacLeod could establish the other elements of fraudulent misrepresentation need not be addressed.

EQUITABLE ESTOPPEL
¶ 18 MacLeod's defense of equitable estoppel is based on his testimony that Chevigny told him they were "even" in the telephone *795 conversation in December 2006. MacLeod claims he reasonably relied on this statement to his detriment.
¶ 19 The principle of equitable estoppel is based upon the reasoning that a party should be held to a representation made or position assumed where inequitable consequences would otherwise result to another party who has justifiably and in good faith relied thereon. Wilson v. Westinghouse Elec. Corp., 85 Wash.2d 78, 81, 530 P.2d 298 (1975). Equitable estoppel requires: (1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement, or admission. Robinson v. City of Seattle, 119 Wash.2d 34, 82, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992). Equitable estoppel is not favored, and a party asserting it must prove each of its elements by clear, cogent, and convincing evidence. Robinson, 119 Wash.2d at 82, 830 P.2d 318.
¶ 20 Here, the issue is whether MacLeod has established that he would suffer injury if Chevigny is allowed to repudiate his statement that the Cornerstone debt was completely paid off. MacLeod declares that he was harmed because once he knew he was no longer indebted to Cornerstone, he proceeded to make an investment in a wind farm:
60. Mr. Chevigny finally agreed that we were even and that I had paid enough. Although our relationship had become more distant than it had been for a long time, our conversation ended amicably; we agreed that we each knew how to get a hold of the other if another deal ever came up.
61. Around that time, beginning in 2006, I had begun to work on a new kind of investment with my son. I had formed Kent Breeze Corporation, and we undertook to install on our farm in Ontario, Canada, equipment designed to convert wind into energy, which could then be contributed to the regional power grid.
62. Having finally put my dispute with Mr. Chevigny and Cornerstone behind me, I focused my energy and resources on developing the wind farm, which we anticipate will be fully operational next year. Rather than making further payments to Cornerstone, I put the money towards the wind farm, buying all the necessary equipment and obtaining the necessary permits; had my dispute with Cornerstone not been resolved, I would not have been able to do so.
¶ 21 According to MacLeod, his testimony supports a reasonable inference that due to the investment in the wind farm, he no longer had funds readily available in June 2007 when Chevigny made his written demand for payment of the Cornerstone debt. But a mere possibility of injury, without a showing that it likely will become a reality, is insufficient to show the harm required to prove estoppel. See Wilson, 85 Wash.2d at 83, 530 P.2d 298 (The claimed deprivation of a possibility of obtaining other employment was too speculative to show that the plaintiff was harmed by being induced to elect early retirement benefits.). At best, MacLeod shows a possibility of injury due to investment in the wind farm. But his testimony is too speculative and too conclusory to prove that making payments into the wind farm venture rendered him unable to resume making payments to Cornerstone.
¶ 22 MacLeod also claims the element of injury is satisfied because, during the months between the December telephone conversation in which Chevigny allegedly waived the debt and the 2007 letters in which Cornerstone demanded payment, the debt accumulated interest and late fees of at least $25,000 that he had no reason to anticipate in view of the alleged waiver. But again, MacLeod does not show that he no longer had funds readily available. And because MacLeod stopped making payments five months before the December 2006 conversation, he cannot show that he was relying on that conversation when he stopped making payments. In short, MacLeod's claim of equitable estoppel fails because there is no evidence of detrimental reliance.

*796 WAIVER
¶ 23 MacLeod contends that Chevigny's statement that they were "even" was a waiver of Cornerstone's right to collect on the note. He then argues that Cornerstone never effectively revoked the waiver. Cornerstone responds that it retracted any waiver that may have occurred through two letters sent to MacLeod on June 22, 2007, and November 6, 2007.
¶ 24 A waiver is generally defined as the voluntary relinquishment of a known right. Seattle-First Nat'l Bank v. Westwood Lumber, Inc., 65 Wash.App. 811, 826, 829 P.2d 1152, review denied, 120 Wash.2d 1010, 841 P.2d 48 (1992). A waiver can be unilateral and without consideration. Panorama Residential Protective Ass'n v. Panorama Corp., 97 Wash.2d 23, 28, 640 P.2d 1057 (1982). When a waiver is given without consideration, the waiving party may reinstate the rights that have been waived upon reasonable notice that gives a reasonable opportunity to comply. Crutcher v. Scott Pub. Co., 42 Wash.2d 89, 97, 253 P.2d 925 (1953); Westwood, 65 Wash.App. at 826 n. 7, 829 P.2d 1152 (1992).
¶ 25 Chevigny's letter of June 22, 2007, notified MacLeod that full performance would be required and gave him a reasonable opportunity to pay up:
Per our discussion today, please find enclosed the loan amortization since the date of the last note signed in June 2005. It includes each monthly payment that you have made, by date and amount, and has been produced on a commercial loan program, ensuring its accuracy. For reference our note dated June 23, 2005 is also included.
The total payoff as of June 30, 2007 amounts to $171,585.44, including late fees ($164,085.44 + $7,500). Late fees amount to 5% of each month's $5,000 payment that has not [been] received timely.
Given the length of time this has been outstanding, I'm sure you'll agree that as a lender we have been extremely lenient.
We would like to wrap this up soon, so please contact me with your plan to pay the balance off in full.
¶ 26 MacLeod contends the letter does not fulfill the requirement of reasonable notice because it does not expressly acknowledge or revoke the waiver. He admits that the standard definition of the notice requirement in cases like Crutcher does not say there must be an express revocation of a prior waiver. MacLeod contends this is because in the usual case, the creditor only implies a waiver, for example by accepting late payments. He claims that where the creditor makes an express waiver, as he alleges Chevigny did in the telephone conversation of December 2006, the creditor must expressly acknowledge the waiver in order to give reasonable notice that it is being retracted. MacLeod cites no authority to support this proposition, and we do not find the argument persuasive.
¶ 27 Because MacLeod gave no consideration for a waiver of the 2005 note by Cornerstone, Cornerstone had the right to retract any such waiver that may have occurred, conditioned upon the obligation to provide reasonable notice and opportunity to comply. While Chevigny's letter of June 2007 implies flexibility regarding payment, a reasonable person reading the letter necessarily reaches only one conclusionCornerstone is demanding MacLeod pay the balance on the 2005 note. We conclude this letter constituted an effective reinstatement of the right MacLeod claims Chevigny waived. Because the June 2007 letter gave MacLeod a reasonable opportunity to develop a payment plan, we need not address MacLeod's argument that the 30 day deadline stated in the debt collection letter of November 2007 was unreasonably short.
¶ 28 The rule allowing reinstatement after waiver is qualified in that a party may not retract a waiver if it would be unjust in view of a material change of a position by the other party in reliance on the waiver. RESTATEMENT (SECOND) OF CONTRACTS § 150 cmt. c (1981), cited in Westwood, 65 Wash. App. at 826 n. 7, 829 P.2d 1152 (1992). As discussed above in connection with equitable estoppel, MacLeod's evidence that he materially changed his position in reliance on Chevigny's statement is speculative at best. He *797 fails to show he was harmed by Cornerstone's retraction of the waiver.
¶ 29 The order granting summary judgment is affirmed. Under the provision for attorney fees in the 2005 note, Cornerstone is entitled to an award of reasonable attorney fees incurred on appeal.
WE CONCUR: DWYER, C.J., and COX, J.