[No. 35505-1-II. Division Two. July 1, 2008.]

PETER GLENN STIENEKE ET AL., *Respondents*, v. TROY RUSSI ET AL., *Appellants*.

---

*Shellie McGaughey* (of *McGaughey Bridges Dunlap, PLLC*) and *Michael S. Rogers* and *Pamela A. Okano* (of *Reed McClure*), for appellants.

*Michael W. Gendler* (of *Gendler & Mann, LLP*), for respondents.

¶1 PENOYAR, A.C.J. — Shortly after the Stienekes took possession of their Gig Harbor home in April 2003, the roof began to leak, causing damage to the home's interior. The Stienekes claimed that prior to closing, the home's previous owner, Russi, orally assured them that he had not had any problems with the roof when, in fact, he had experienced several roof leaks during the course of his ownership of the home. The Stienekes also claimed that Russi misrepresented the roof's history in a seller disclosure statement he completed and signed prior to closing. In reliance on Russi's oral representations and the statement in the disclosure form, the Stienekes chose to forgo a roof inspection and to complete the transaction. After a bench trial, the trial court found the Russis liable for breach of contract and negligent misrepresentation. The Russis appeal, arguing that (1) the trial court erred in finding them liable for breach of contract, (2) the trial court erred in finding them liable for negligent misrepresentation, (3) the trial court deprived them of their constitutional right to a jury trial, and (4) the trial court erred in granting attorney fees and expenses to the Stienekes. We reverse the trial court's breach of contract and negligent misrepresentation rulings, but we hold that the trial court made sufficient findings to support claims based on fraud. Because, however, the trial court did not determine whether these facts underlying the fraud claims had been established to the required level of proof— clear, cogent, and convincing—we remand for the trial court to determine whether the required level of proof was met.

## FACTS

¶2 On March 6, 2003, Troy and Renea Russi sold their Gig Harbor home to Peter (Glenn) and Cynthia Stieneke. Sterling Griffin of Keller Williams Realty acted as the Stienekes' real estate agent. The Russis were not represented in the transaction. That day, the Russis and the Stienekes entered into a residential real estate purchase and sale agreement (REPSA).

¶3 The REPSA included an inspection addendum. The addendum conditioned the agreement on the Stienekes' ap-

proval of a property inspection. It provided, "This inspection contingency SHALL CONCLUSIVELY BE DEEMED SATISFIED (WAIVED) unless Buyer gives notice of disapproval within 5 days . . . of mutual acceptance of this Agreement." Ex. 32, ¶ 1(b). The addendum provided the seller the opportunity to correct the conditions identified in the buyer's notice, offer an alternative remedy for the disapproved conditions, or decline making the repairs.

¶4 The REPSA also included an integration clause. That clause provided, "This Agreement constitutes the entire understanding between the parties and supersedes all prior or contemporaneous understandings and representations. No modification of this Agreement shall be effective unless agreed in writing and signed by Buyer and Seller." Ex. 32, ¶ n.

¶5 On March 10, 2003, Troy Russi signed a completed "Real Property Transfer Disclosure Statement" (Form 17).[1] Before signing the document, Russi answered a series of questions that Griffin read aloud to him. Griffin recorded each answer on the form as it was provided. Question 4A read, "Has the roof leaked?" Ex. 36. When Russi answered in the negative, Griffin checked the "no" box next to question 4A. Russi then initialed each page and signed the disclosure statement without reading it.

¶6 Form 17 stated, "THIS INFORMATION IS FOR DISCLOSURE ONLY AND IS NOT INTENDED TO BE A PART OF ANY WRITTEN AGREEMENT BETWEEN THE BUYER AND THE SELLER." Ex. 36. In addition, the form required buyers to acknowledge, "This information is for disclosure only and is not intended to be a part of the written agreement between Buyer and Seller." Ex. 36. The Stienekes also reviewed and signed the document.

¶7 In accordance with the inspection addendum, the Stienekes hired Jim O'Brien and O'Brien Home Inspection

---

[1] In 1994, the Washington Legislature adopted chapter 64.06 RCW. It requires sellers of improved residential real property to deliver to buyers a completed seller disclosure statement. The minimum contents of these statements are mandated by statute. *See* RCW 64.06.020(1). RCW 64.06.030 creates the power of rescission.

to conduct a property inspection on March 10, 2003. During the inspection, O'Brien informed the Stienekes that he did not perform roof inspections. After his inspection, O'Brien provided the Stienekes a written inspection report. The report did not contain any information regarding interior water damage and did not indicate that the roof may have leaked in the past. When the Stienekes asked Troy Russi questions regarding the property, Russi responded that he had not had any problems with the roof. In fact, Troy Russi experienced roof leaks at various times during his ownership of the home. On multiple occasions between 1994 and 1997, Russi contacted a roofer, who made repairs to the Russis' roof. Although Troy Russi did not contact anyone regarding any further roof leaks subsequent to 1997, the Russis had postleak repairs made to the interior in 1999.

¶8  Griffin obtained the Russis' permission to extend the inspection contingency so that the Stienekes could have the roof inspected. When the second inspector arrived to inspect the roof on March 21, 2003, he was unable to do so because rain presented hazardous working conditions. In reliance on Troy Russi's oral assurances that he had not had problems with the roof and on Russi's answer to question 4A, the Stienekes chose to forgo the roof inspection and complete the transaction.

¶9  On April 25, 2003, the sale closed and the Stienekes took possession of the property. About one month later, they arranged for a company to power wash the roof. The Stienekes experienced water intrusion from the roof into the front entry of the home during the cleaning. When Glenn Stieneke informed Troy Russi (who had relocated to a nearby home) of the leak, Russi told him that he previously had a raccoon on the roof. He did not mention that he previously experienced leaks or that he had to have repairs made because of those leaks. Thereafter, the Stienekes experienced water intrusion during or after every incident of heavy rainfall. The water caused extensive damage to the Stienekes' ceiling, walls, and wood floor.

¶10 In January 2004, the Stienekes filed a complaint seeking rescission of their agreement with the Russis, alleging fraudulent concealment, fraudulent misrepresentation, and breach of contract. They also sought damages from Griffin and Keller Williams Realty for professional negligence, breach of fiduciary duty, negligent misrepresentation, and Consumer Protection Act, chapter 19.86 RCW, violations. The Stienekes later amended their complaint to add a negligent misrepresentation claim against the Russis.

¶11 On May 27, 2004, the Stienekes filed a jury demand. On October 6, 2005, Griffin and Keller Williams Realty filed a motion to strike the Stienekes' jury demand. The Russis opposed this motion. The trial court granted the motion to strike the Stienekes' jury demand, finding that the primary relief sought was rescission. In announcing its decision, the trial court explained that it had carefully considered the right to jury trial in making its decision.

¶12 Before trial, the trial court partially granted Griffin and Keller Williams Realty's motion for summary judgment, finding that the Stienekes had no claim against Griffin and Keller Williams Realty for rescission and denying any claim for negligent misrepresentation regarding water damage, the carpets, the need for a septic inspection, or the cabinets.

¶13 After a bench trial, the trial court issued its oral decision in the Stienekes' favor. It found the Russis liable for negligent misrepresentation and breach of contract. The trial court concluded that Form 17 was a part of the REPSA, "pursuant to its terms and pursuant to the circumstances surrounding the formation of the agreement as established by the evidence," and that Troy Russi's misrepresentation regarding the roof's history in Form 17 constituted a material breach of the REPSA. Clerk's Papers (CP) at 626. The trial court also found Griffin and Keller Williams Realty liable for negligence and breach of fiduciary duty.

¶14 Although the trial court found that the Stienekes had a right of rescission, they elected to receive damages instead. The total damages awarded amounted to $72,048.50, representing the cost to repair the roof and flooring, the cost of sheetrock and painting, and the cost of storage and temporary housing during repairs. The trial court found that the Russis were responsible for 45 percent of the Stienekes' damages and that Griffin and Keller Williams Realty were responsible for the remaining 55 percent; it held the defendants jointly and severally liable for all damages. Finally, the trial court imposed $174,578.90 in attorney fees and expenses against the Russis pursuant to the REPSA's attorney fees clause.

¶15 The Russis now appeal. Griffin and Keller Williams Realty are not parties to this appeal.

## ANALYSIS

### I. NEGLIGENT MISREPRESENTATION

¶16 The Stienekes argue that the economic loss rule does not bar their negligent misrepresentation claim because the trial court awarded damages for "property damage to property *other than the defective product or property*" and that such damages are distinguished from "economic losses," which are precluded by the economic loss rule. Resp'ts' Br. at 43-44 (emphasis added). We disagree. As we explain below, persuasive authority and common sense dictate that a building constitutes a single "product" or "property," not a series of component parts, for purposes of the economic loss rule. The alleged damages in this case are therefore economic losses, and, as explained below, the economic loss rule precludes the Stienekes' tort claim for negligent misrepresentation.

¶17 We review questions of law and conclusions of law de novo. *See Veach v. Culp*, 92 Wn.2d 570, 573, 599 P.2d 526 (1979); *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). The Washington Supreme Court recently addressed the economic loss rule in

*Alejandre v. Bull*, 159 Wn.2d 674, 153 P.3d 864 (2007). Where parties have entered into a contractual relationship, and merely economic losses occur, the economic loss rule bars the complaining party from asserting tort remedies. *Alejandre*, 159 Wn.2d at 682-83. Instead, the party is limited to the contract remedies that the parties bargained for and agreed upon. *Alejandre*, 159 Wn.2d at 682-83. The *Alejandre* court explained that the key inquiry is the nature of the loss and the manner in which the damage occurred: "[E]conomic losses are generally distinguished from physical harm or . . . damage to property other than the defective product or property." *Alejandre*, 159 Wn.2d at 685. In other words, when a product fails to function properly and injures only itself, the loss is an economic loss and the parties are limited to their contract remedies. However, when a defective product injures something other than itself, such as a person or other separate property, the loss is not merely an economic loss and tort remedies are appropriate. *See Griffith v. Centex Real Estate Corp.*, 93 Wn. App. 202, 213, 969 P.2d 486 (1998).

¶18 The *Alejandre* court applied these principles to determine whether the economic loss rule precluded a buyer's negligent misrepresentation claim against the seller of a residential home. In that case, Bull had provided the Alejandres with a seller's disclosure statement prior to closing, in which she answered "no" when asked whether there were any defects in the operation of the home's septic system. However, Bull did disclose that she had recently replaced a broken line between the house and the septic tank. *Alejandre*, 159 Wn.2d at 679. The septic tank failed shortly after the Alejandres took possession of the home, and a septic tank service company informed the Alejandres that they could not repair the septic system. The service company also informed the Alejandres that they had told Bull that she needed to connect to the city's sewer system because her drain fields were not working properly. *Alejandre*, 159 Wn.2d at 680. The Alejandres filed a claim for negligent misrepresentation against Bull, and the court

held that the loss was purely economic because the only injury complained of was a defective septic system that had not caused personal injury or damage to other property. Therefore, the economic loss rule barred the Alejandres' tort claim for negligent misrepresentation and limited them to their contract remedies. *Alejandre*, 159 Wn.2d at 685.

¶19 The present case similarly involves a negligent misrepresentation claim between the buyer and the seller of a residential home. Unlike in *Alejandre*, however, the Stienekes claim that a defective product injured property other than itself. The Stienekes essentially argue that the roof is the "defective product" in this case, and the water damage it caused to the "sheetrock and paint, flooring, storage and housing" in the interior of the home constitutes damage to property other than the defective product. Resp'ts' Br. at 44. Washington has not clearly defined the line between "defective property" and "other property" in the context of buildings and homes. *See, e.g., Alejandre*, 159 Wn.2d 674 (alleging damage to a defective septic system only and not to other property); *Griffith*, 93 Wn. App. 202 (alleging damage to defective siding only). However, other jurisdictions have addressed this issue.

¶20 When determining whether a product has injured only itself, or has injured other property as well, courts have held that it is necessary to look to the product the plaintiff purchased and not the product the defendant sold. *See Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 271 (Me. 1995); *see also Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 930 (5th Cir. 1987) ("product" means the finished product bargained for by the buyer, not the individual component parts of the product). Based on this principle, the Florida Supreme Court held that damage caused to a condominium building by defective concrete was not damage to property other than the defective property because the plaintiffs had purchased finished homes, not component parts of the homes. *Casa Clara Condo. Ass'n v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1247 (Fla. 1993).

¶21 Similarly, the Nevada Supreme Court held that water damage to flooring and ceilings caused by defective roofing and siding on townhouses was not damage to "other property" under the economic loss rule. *Calloway v. City of Reno*, 116 Nev. 250, 993 P.2d 1259, 1261-63, 1269-70 (2000). The *Calloway* court reasoned that "the townhouses are part of larger, integrated structures, and the framing was an integral component of these structures." *Calloway*, 993 P.2d at 1269. Therefore, damage caused by the defective framing "constituted damage to the structures themselves—no 'other' property damage resulted." *Calloway*, 993 P.2d at 1269. The Nevada Supreme Court also observed that "[o]ther jurisdictions have concluded that a defective building creates only economic loss, even if the particular defect causes damage to other parts of the structure." *Calloway*, 993 P.2d at 1268 (citing *Chi. Heights Venture v. Dynamit Nobel of Am., Inc.*, 782 F.2d 723 (7th Cir. 1986); *Nastri v. Wood Bros. Homes, Inc.*, 142 Ariz. 439, 690 P.2d 158 (Ct. App. 1984); *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194 (Del. 1992); *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 441 N.E.2d 324, 65 Ill. Dec. 411 (1982); *County of Chenango Indus. Dev. Agency v. Lockwood Greene Eng'rs, Inc.*, 114 A.D.2d 728, 494 N.Y.S.2d 832 (1985); *Am. Towers Owners Ass'n v. CCI Mech., Inc.*, 930 P.2d 1182 (Utah 1996)); *see also Ass'n of Apartment Owners of Newton Meadows v. Venture 15, Inc.*, 115 Haw. 232, 167 P.3d 225, 286 (2007) (quoting *Calloway*, 993 P.2d at 1268).

¶22 Here, the Stienekes' home interior damage does not constitute "damage to property other than the defective property or product" for the same reasons discussed above. The Stienekes purchased a finished home from the Russis, not component parts. The defective roof that caused damage to the home's interior is an integral component of the home's overall structure, not a separate "product" or piece of "property." *See Calloway*, 993 P.2d at 1269; *Venture 15*, 167 P.3d at 286. As many jurisdictions have recognized, a defective building creates purely economic loss if it further injures itself. *See Calloway*, 993 P.2d at 1269. This is true

even if the particular defect, such as a defective roof, causes damage to other parts of the building's structure. The Stienekes' claimed damages are not damage to property other than the defective property or product because the house's defective roof damaged the house, creating purely economic losses. There is no reason to draw a distinction between the defective and the damaged parts of the improvements; the point is that both are subjects of the parties' contract and any assurances of their condition should be evaluated through that agreement. Thus, the rationale for barring tort damages under the economic loss rule is persuasive here also. We reverse the trial court's damage award for negligent misrepresentation.

## II. FRAUDULENT CONCEALMENT AND FRAUD

¶23 The Stienekes argue that a judgment can be affirmed on any ground within the pleadings and the proof and that the trial court's judgment should be affirmed on the alternative grounds of fraudulent concealment and fraud. They contend that the trial court found all elements of both fraudulent concealment and fraud present and that substantial evidence supports all of the trial court's findings. In response, the Russis argue that the aforementioned precept does not apply where the trial court did not make findings on material facts on which the plaintiff had the burden of proof. The Russis contend that because the trial court did not find all elements of fraudulent concealment and fraud to be present, they cannot be liable on these grounds. We hold that the trial court made sufficient findings to support claims based on fraud but did not find whether these facts had been established to the required level of proof: clear, cogent, and convincing evidence. We remand on this issue.

¶24 It is well recognized that an appellate court may uphold the trial court's ruling on appeal on " 'any basis supported by the record.' " *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 493, 933 P.2d 1036 (1997) (quoting *Hadley v. Cowan*, 60 Wn. App. 433, 444, 804 P.2d 1271 (1991)). An

appellate court can sustain the trial court's judgment upon any theory established by the pleadings and supported by the proof, even if the trial court did not consider it. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027, *cert. denied*, 493 U.S. 814 (1989); *see also Nw. Collectors, Inc. v. Enders*, 74 Wn.2d 585, 595, 446 P.2d 200 (1968) ("the trial court can be sustained on any ground within the proof"); *Kirkpatrick v. Dep't of Labor & Indus.*, 48 Wn.2d 51, 53, 290 P.2d 979 (1955) ("[w]here a judgment or order is correct, it will not be reversed because the court gave a wrong or insufficient reason for its rendition"). We review findings of fact under a substantial evidence standard. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986). The *Alejandre* court reaffirmed that the economic loss rule does not apply to claims of fraud, stating, "[U]nder *Atherton* [*Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 799 P.2d 250 (1990)], the Alejandres' fraudulent concealment claim is not precluded by the economic loss rule." 159 Wn.2d at 689.

A. Fraudulent Concealment

■■ ■■ ¶25 On a claim for fraudulent concealment, the seller's duty to speak arises

> where (1) the residential dwelling has a concealed defect; (2) the vendor has knowledge of the defect; (3) the defect presents a danger to the property, health, or life of the purchaser; (4) the defect is unknown to the purchaser; and (5) the defect would not be disclosed by a careful, reasonable inspection by the purchaser.

*Alejandre*, 159 Wn.2d at 689 (citing *Obde v. Schlemeyer*, 56 Wn.2d 449, 353 P.2d 672 (1960); *Atherton*, 115 Wn.2d at 524). Failure to disclose a material fact where there is a duty to disclose is fraudulent. *McRae v. Bolstad*, 32 Wn. App. 173, 177, 646 P.2d 771 (1982) (citing *Obde*, 56 Wn.2d

449), *aff'd*, 101 Wn.2d 161, 676 P.2d 496 (1984). Each element of fraudulent concealment must be established by clear, cogent, and convincing evidence. *See Hughes v. Stusser*, 68 Wn.2d 707, 709, 415 P.2d 89 (1966).

¶26 The *Atherton* court addressed the relationship between reliance on the seller's representations (or lack thereof) and the duty to inspect:

> Although a fraudulent concealment claim may exist even though the purchaser makes no inquiries which would lead him to ascertain the concealed defect, in those situations where a purchaser discovers evidence of a defect, the purchaser is obligated to inquire further. Simply stated, fraudulent concealment does not extend to those situations where the defect is apparent.

115 Wn.2d at 525 (citations omitted).

¶27 Here, the trial court made sufficient findings to support a claim based on fraudulent concealment. The trial court found that when asked about the roof, Russi failed to disclose that the roof had leaked in the past. The trial court also found that the roof's condition threatened and caused damage to the Stienekes' property and materially defeated the purpose of the transaction, and that the Stienekes did not know that the roof had leaked when they purchased the property.[2] Finally, the trial court found that the history of roof leaks was not readily apparent from a property inspection.

¶28 The Russis' assertion that Troy Russi did not know of the defect at the time of the misrepresentations is unpersuasive. The trial court found that Troy Russi experienced roof leaks "at various times" during his ownership of the home, apparently accepting roofing contractor Bruce Hunter-Duschel's testimony that Russi was "never shy

---

[2] The Russis argue in passing that "the roof's *history*—by its very nature— would not have presented a danger to the purchaser's property or health." Appellants' Reply Br. at 17. They then state, "To the extent the trial court found otherwise, it erred." Appellants' Reply Br. at 17. Clearly, the condition of the roof presented a danger to the Stienekes' property. Although the Russis creatively reframe the issue by emphasizing the word "history," their argument is unpersuasive.

about calling if there was a roof leak" between 1994 and 1997. CP at 622; Report of Proceedings (RP) at 1027. The Russis' argument that a careful, reasonable inspection would have revealed the defect is also unpersuasive. The Russis' own roof expert's testimony supports the finding that a careful, reasonable inspection would *not* have revealed the defect. In January 2005, William Cypher was called to the Stienekes residence to "determine whether [he] could identify a source for the moisture intrusion coming through the roof." RP at 431-32. Cypher was informed of the "interior leak location in the foyer" and understood that his purpose was "to look at the areas of the roof directly above [it]." RP at 431. Following his inspection, Cypher concluded that "the roof assembly showed no conditions that would be contributing to moisture intrusion and that it was properly installed." RP at 467.

¶29 When asked whether he would have to do something further in order to render an opinion regarding the cause or origin of that leak (if the Stienekes had continued to experience an interior roof leak subsequent to his January 2005 visit), Cypher answered in the affirmative. Cypher explained that he would have to perform a more in depth leak investigation, which may include water testing and additional disassembly[3] of the roof. Cypher estimated that this process could take anywhere from one to three days and that the investigation, disassembly, and necessary repairs would ultimately cost approximately $10,000. Given the fact that the Russis' own expert was unable to identify the source of the leak—even though he had been told where to look—without a more invasive inspection, substantial evidence supports the trial court's finding that the roof's history was not readily apparent and that even a careful, reasonable inspection would not have revealed the defect). Thus, the trial court made findings sufficient to support a claim based on fraudulent concealment. Whether

---

[3] Cypher had previously disassembled a portion of the roof in January 2005 and testified that in order to make a more definitive determination regarding the water intrusion he would have to disassemble a greater area of the roof.

the trial court applied the correct burden of proof is addressed below.

## B. Fraud

¶30 A plaintiff claiming fraud must prove each of the following nine elements:

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996). Each element of fraud must be established by clear, cogent, and convincing evidence. *Stiley*, 130 Wn.2d at 505.

¶31 Here, the trial court also made sufficient findings to support a claim based on fraud. It found that Troy Russi orally represented to the Stienekes that he had not had any problems with the roof (representation of an existing fact). It also found that his representations regarding the roof were false (falsity). The trial court found that the Stienekes did not know that the roof had leaked when they purchased the property (plaintiff's ignorance of its falsity). Furthermore, it found that the Stienekes relied on Troy Russi's oral and written statements regarding the roof (plaintiff's reliance on the truth of the representation). The trial court found that the Stienekes' reliance was reasonable and justifiable and that the roof's history was not readily apparent from a property inspection (plaintiff's right to rely upon it). Finally, the trial court found that Russi's misrepresentations of the roof's history pertained to a condition which caused damage to the property and materially defeated the REPSA's purpose (materiality; damages suffered by the plaintiff).

¶32 Consistent with those findings, the trial court concluded that Russi's oral representations were false, the Stienekes relied on the false information and had a right to

rely on it, their reliance was both reasonable and justifiable, the roof's history was material to the transaction, and the misrepresentations were a direct and proximate cause of the Stienekes' damages. The trial court also concluded that the Stienekes were not careless, negligent, contributorily negligent, or at fault with respect to the roof's history, the roof leak, and the resulting damage.

¶33 The Russis argue that the trial court failed to make findings regarding two elements of fraud: the speaker's knowledge of the representation's falsity and the plaintiff's right to rely upon the representation. The Russis contend that the trial court failed to find that Troy Russi knew that his representations were false. However, the trial court did find that Russi orally assured the Stienekes that he had not had any problems with the roof. Further, it concluded that those representations were false. The Russis point to the trial court's acknowledgement that Russi "may well have made a completely innocent misstatement [when he answered question 4A regarding the roof's history]." RP at 1782. However, the trial court also found that Russi experienced roof leaks at various times during his ownership of the home and contacted Hunter-Duschel to make repairs on several occasions between 1994 and 1997. The evidence establishes that Russi knew that the roof had problems in the past when he orally represented otherwise to the Stienekes.

¶34 The Russis also argue that the Stienekes did not have the right to rely upon the Russis' representations. The *Alejandre* court explained that "the 'right to rely' element of fraud is intrinsically linked to the duty of the one to whom the representations are made to exercise diligence *with regard to those representations.*" 159 Wn.2d at 690 (emphasis added) (citing *Williams v. Joslin*, 65 Wn.2d 696, 698, 399 P.2d 308 (1965)). Here, Troy Russi made assertions regarding the roof's history. The Stienekes relied on those representations in limiting their roof inspection. Additionally, Cypher's testimony was that a reasonable property examination would not have uncovered what Russi

affirmatively misrepresented. This evidence supports the trial court's finding that the defect was not readily apparent from a property inspection, that the Stienekes had a right to rely on those representations, and that their reliance was justifiable under the circumstances.

¶35 As stated above, the burden of proof for both fraudulent concealment and fraud is clear, cogent, and convincing evidence. *Hughes*, 68 Wn.2d at 709; *Stiley*, 130 Wn.2d at 505. We find that the trial court made sufficient findings to support both claims based on fraud but it did not find whether these facts had been established to the required level of proof. We remand for the trial court to determine whether this level of proof was ultimately met.

III. BREACH OF CONTRACT

¶36 The Russis argue that finding of fact (FF) 28 and conclusion of law (CL) 8, in which the trial court found that Form 17 became a part of the REPSA, are erroneous. Consequently, they argue that all findings of fact (FF 28-30, 33-34, 36) and conclusions of law (CL 8, 16-20) regarding the Stienekes' breach of contract claim are unsupported by the law or the facts. The Russis rely primarily on the terms of the documents and common law integration principles to support their argument.[4] In response, the Stienekes argue that we review a court's judgment after a bench trial under the substantial evidence test and that such review is "limited." Resp'ts' Br. at 19. The Stienekes contend that the trial court did, in fact, identify the "circumstances surrounding the formation of the agreement as established by the evidence," which supported its conclusion that Form 17 became a part of the parties' contract. CP at 626. They also argue that because Form 17 was in writing and both parties signed it, it operated as a modification of the REPSA pursuant to the agreement's integration clause. We disagree.

---

[4] The Russis also rely on RCW 64.06.020 to support their argument that Form 17 did not become a part of the REPSA. The Russis failed to raise this statute below; therefore, we did not consider it on appeal.

¶37 Findings of fact are reviewed under a substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational, fair-minded person that the premise is true. *Wenatchee Sportsmen Ass'n*, 141 Wn.2d at 176. If the standard is satisfied, we will not substitute our judgment for that of the trial court even though it may have resolved a factual dispute differently. *See Croton Chem. Corp. v. Birkenwald, Inc.*, 50 Wn.2d 684, 686, 314 P.2d 622 (1957). We review questions of law and conclusions of law de novo. *See Veach*, 92 Wn.2d at 573. We may resort to the trial court's oral decision to ascertain the legal and factual basis upon which the trial court predicated its finding. *See Schmechel v. Ron Mitchell Corp.*, 67 Wn.2d 194, 197, 406 P.2d 962 (1965).

¶38 Here, the REPSA contained an integration clause stating:

> This Agreement constitutes the entire understanding between the parties and supersedes all prior or contemporaneous understandings and representations. No modification of this Agreement shall be effective unless agreed in writing and signed by Buyer and Seller.

Ex. 32, ¶ n.

¶39 Form 17, which was completed and signed four days after the parties entered into the REPSA, required the Stienekes to acknowledge, "This information is for disclosure only and is not intended to be a part of the written agreement between Buyer and Seller." Ex. 36, at 5. The buyer acknowledgment, which mirrored a provision located on the first page of the document, was signed by Cynthia Stieneke on March 10, 2003.

¶40 In its oral ruling, the trial court stated that it would be "completely nonsensical and counter to the whole idea of the Form 17" to include an integration clause in a purchase and sale agreement that has already been executed "but then . . . have a license to say anything that you want in Form 17." RP at 1771. It then concluded that "when Form 17 is executed, there is an understanding that that is going

to be a part of the deal." RP at 1771. Later, the trial court noted that had Russi read Form 17 himself, he would have spotted the discrepancy; instead, he signed the legal document without reading it. However, substantial evidence does not support the trial court's finding that Form 17 became a part of the REPSA.

¶41 The trial court reasoned that allowing sellers to disclaim responsibility for the contents of Form 17 because of an integration clause in a previously signed document would "stand the whole thing on its head." RP at 1771. Although it acknowledged that Form 17 gave the Stienekes a right of rescission for three business days after the document's delivery, it failed to explain why the existence of this provision served as confirmation of the parties' intent to modify the REPSA. The record lacks any evidence indicating that Griffin, the Russis, or the Stienekes understood or intended that Form 17 would or did become a part of the parties' purchase and sale agreement.

¶42 In addition, the terms of both Form 17 and the REPSA fail to provide evidence that Form 17 became a part of the contract. First, the REPSA's integration clause explicitly provided, "This Agreement constitutes the entire understanding between the parties . . . . No modification of this Agreement shall be effective unless agreed in writing and signed by Buyer and Seller." Ex. 32, ¶ n. The Stienekes' argument that Form 17, which was in writing, was signed by both parties, and is thus a modification, is tenuous. The evidence fails to demonstrate that the parties intended for Form 17 to operate as such.

¶43 Second, Form 17 provided two written indications that it "[was] for disclosure only and [not to be considered] a part of any written agreement between the Buyer and the Seller." Ex. 36, at 1. The Stienekes signed this document four days after the parties entered into the purchase and sale agreement. Third, the REPSA contained no language making it contingent upon Form 17. Rather, it contained terms making it contingent upon the buyers' inspection. While the trial court's policy concerns warrant consider-

ation, its finding is unsupported by evidence sufficient to persuade a rational, fair-minded person that Form 17 became a part of the parties' REPSA.

¶44 CL 8 held that "[t]he Disclosure Statement was part of the agreement between the Russis and the Stienekes, pursuant to its terms and pursuant to the circumstances surrounding the formation of the agreement as established by the evidence." CP at 626. It also held that Troy Russi's misrepresentation regarding the roof in Form 17 constituted a material breach of the REPSA and that breach was the proximate cause of the Stienekes' damages. Substantial evidence does not support the trial court's finding that Form 17 became a part of the REPSA.

## IV. CR 41(b)(3) MOTION TO DISMISS

¶45 The Russis argue that the trial court should have granted their CR 41(b)(3) motion to dismiss the Stienekes' claims.[5] They argue that "the trial court should have never even gotten as far as entering findings and conclusions" because there was no evidence, or reasonable inferences therefrom, that would have supported a verdict in the Stienekes' favor. Appellants' Br. at 13. Conversely, the Russis contend that because the trial court's findings and conclusions regarding the Stienekes' breach of contract and negligent misrepresentation claims were erroneous, so too was its decision to deny their CR 41(b)(3) motion to dismiss those claims. In response, the Stienekes argue that we need not consider issues that are inadequately briefed and not supported by authority, and that the Russis merely "argue [this point] in passing." Resp'ts' Br. at 25. The Stienekes' argument is convincing. Furthermore, as indicated elsewhere in this opinion, the Stienekes presented sufficient evidence to support at least some of their claims.

---

[5] CR 41(b)(3) governs dismissals in bench trials. Under CR 41(b)(3), dismissal is proper "if there is no evidence, or reasonable inferences therefrom, that would support a verdict for the plaintiff." *Willis v. Simpson Inv. Co.*, 79 Wn. App. 405, 410, 902 P.2d 1263 (1995).

## V. RIGHT TO JURY TRIAL

### A. Right to Jury Trial

¶46 The Russis argue that they were deprived of their constitutional right to a jury trial when the trial court struck the Stienekes' jury demand. They argue that we should reverse and remand for a new trial before a jury. At the very least, they contend, a jury should have been impaneled to hear the buyers' damages case. Furthermore, the Russis emphasize the fact that the Stienekes vigorously objected when Griffin and Keller Williams Realty moved to strike the Stienekes' jury demand. Thus, the Stienekes should not now be heard to claim that the trial court did not err in striking their jury demand. We disagree.

¶47 There is a right to a jury trial where the civil action is purely legal in nature. Conversely, where the action is purely equitable in nature, there is no right to a jury trial. *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 365, 617 P.2d 704 (1980). In determining whether a case is primarily equitable in nature or is an action at law, the trial court is accorded wide discretion, the exercise of which will not be disturbed except for clear abuse. *Brown*, 94 Wn.2d at 368. This discretion should be exercised with reference to a variety of factors including, but not necessarily limited to, the following factors:

> "(1) who seeks the equitable relief; (2) is the person seeking the equitable relief also demanding trial of the issues to the jury; (3) are the main issues primarily legal or equitable in their nature; (4) do the equitable issues present complexities in the trial which will affect the orderly determination of such issues by a jury; (5) are the equitable and legal issues easily separable; (6) in the exercise of such discretion, great weight should be given to the constitutional right of trial by jury and if the nature of the action is doubtful, a jury trial should be allowed; (7) the trial court should go beyond the pleadings to ascertain the real issues in dispute before making the determination as to whether or not a jury trial should be granted on all or part of such issues."

*Brown*, 94 Wn.2d at 368 (quoting *Scavenius v. Manchester Port Dist.*, 2 Wn. App. 126, 129-30, 467 P.2d 372 (1970)).

¶48 Here, the trial court had "wide discretion" to determine whether the action was primarily legal or equitable in nature. *Brown*, 94 Wn.2d at 368. Although it recognized the important function that juries serve, the trial court determined that the main issues were primarily equitable, stating, "[R]escission is a relatively profound remedy. It has certainly been pled by the Stienekes as their first -- as the first thing that they want. It is clearly an equitable relief." RP at 65-66. Further, the trial court discussed the complexities that would affect the orderly determination of such issues by the jury. The trial court stated, "It would certainly have a profound impact on how the other issues would sort out should that relief be granted. That is certainly relief that the jury is not capable to do because sometimes equity has to do with a lot of sort of micro management in order to get people into what is a fair position." RP at 66.

¶49 The Russis fail to demonstrate that the trial court's decision to hold a bench trial constituted an abuse of discretion. Although they point to the fact that it was the Stienekes who both sought equitable relief and filed the jury demand, they fail to show how the trial court misapplied the remaining *Brown* factors in determining whether the action was primarily equitable in nature. Thus, the Russis' argument that they were deprived of their constitutional right to a jury fails.

¶50 The Russis' argument that a jury should have been impaneled to hear the buyers' damages case similarly fails. First, the case they cite in support of this proposition, *Auburn Mech., Inc. v. Lydig Constr., Inc.*, 89 Wn. App. 893, 951 P.2d 311 (1998), differs from the present case. There, the court held that there was a right to jury trial because the plaintiff sought money damages as its sole remedy. *Auburn Mech., Inc.*, 89 Wn. App. at 901-02. Second, the Russis failed to request this in their opposition to the

motion to strike below. We will not disturb the trial court's decision to strike the jury demand.

### B. Advisory Jury

¶51 Alternatively, the Russis argue that the trial court should have used an advisory jury on all or at least some of the issues. Again, we disagree.

¶52 CR 39(c) states, "In all actions not triable of right by a jury the court, upon motion or of its own initiative, may try an issue with an advisory jury or it may, with the consent of both parties, order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right." CR 39 vests wide discretion in the trial court in cases involving both legal and equitable issues, to allow a jury on some, none, or all issues presented. *Scavenius*, 2 Wn. App. at 129.

¶53 Here, the trial court had wide discretion to determine whether to use an advisory jury under CR 39(c). However, it was not required to impanel such a jury. Further, the Russis failed to request an advisory jury below and have failed to argue with specificity why the trial court should have used an advisory jury on all or at least some of the issues. The trial court did not err in failing to impanel an advisory jury.

### VI. Attorney Fees and Expenses Award at the Trial Court

¶54 If a tort action is based on a contract central to the dispute that includes an attorney fee provision, the prevailing party may receive attorney fees. *Hill v. Cox*, 110 Wn. App. 394, 412, 41 P.3d 495 (2002). An action is "on the contract" if the action arose out of the contract and if the contract is central to the dispute. *Hill*, 110 Wn. App. at 412. The Stienekes' fraud claims are "on the contract." *Hill*, 110 Wn. App. at 411-12. Because we remand for the trial court to determine whether the required level of proof was met regarding the Stienekes' fraud claims, the prevailing party is not yet determined. Thus, we do not address this issue.

VII. ATTORNEY FEES ON APPEAL

¶55 Citing RAP 18.1, the Russis contend that they are entitled to attorney fees both in the trial and appellate courts if they prevail on appeal. The Stienekes have also requested fees on appeal. Because we remand this case, neither party is entitled to attorney fees. If the trial court finds that the Stienekes met the required standard of proof, it should award attorney fees for this appeal as well.

¶56 We reverse the trial court's breach of contract and negligent misrepresentation rulings, but we hold that the trial court made sufficient findings to support claims based on fraud and fraudulent concealment. Because the trial court did not find whether these facts had been established to the required level of proof—clear, cogent, and convincing—we remand for the trial court to determine whether the required level of proof was met.

BRIDGEWATER and HUNT, JJ., concur.

Review denied at 165 Wn.2d 1026 (2009).