IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| AVANTI MARKETS INC., a Washington corporation; and JIM BRINTON, an individual, | No. 81064-2-I |
| Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| HAPPAY, INC., a Washington corporation; COREY WILLIAMS and JANE DOE WILLIAMS, husband and wife; and DANIEL LEEKS and JANE DOE LEEKS, husband and wife, | |
| Appellants. | |

SMITH, J. — Avanti Markets Inc. and its owner, Jim Brinton, sued Avanti's software support company, Happay Inc., and its owners, Corey Williams and Daniel Leeks, after the contractual relationship between the two companies terminated. The trial court concluded that Williams and Leeks had defrauded Brinton and that Happay had breached its contract with Avanti. The court imposed joint and several liability against Happay and its owners for damages resulting from Happay's failure to achieve compliance with payment card industry (PCI) software standards, Happay's inflation of costs passed on to Avanti, and costs Brinton incurred as a result of fraud. The court also granted attorney fees to Brinton and Avanti. Finding no error, we affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Avanti is a Washington corporation that provides the equipment and software necessary to operate "micro markets," small unattended stores that sell food and beverages. Avanti micro markets use a sophisticated and valuable software to facilitate retail transactions. A small Avanti-owned company, Byndl, provided technical support for the Avanti software. In April 2016, to ensure Byndl was running efficiently and optimally, Avanti hired a software consulting company called Boxspy.

At the time, Corey Williams was a co-owner of Boxspy, and Daniel Leeks was a Boxspy employee. Boxspy assigned Leeks to Avanti's project, and Leeks was ultimately installed as the head of engineering at Byndl to direct and oversee the engineering team and its development schedule and procedures. Leeks worked in this role as an employee of Boxspy from May to August of 2016.

Jim Brinton is the sole owner of Avanti. According to Brinton's testimony and the trial court's findings, Williams, Leeks, and Brinton (along with a fourth party who later pulled out of negotiations) began discussions to form a company that would take over Byndl's role of technical support and ultimately pursue other profitable software opportunities. Williams and Leeks led Brinton to believe that they could perform Byndl's role more efficiently than Byndl. Brinton would provide the new company with start-up revenue as well as the opportunity to enter a lucrative contract with Avanti, and in exchange, Brinton would own 65 percent of the shares and Williams and Leeks would each own 7.5 percent.

2

Brinton, Williams, and Leeks entered an oral agreement to this effect around August 31, 2016.

On September 1, 2016, Avanti and the new company, Happay, executed the "Service and License Agreement" (SLA). Under the SLA, Happay would receive 30 percent of all of Avanti's service fee revenues as well as commissions on new Avanti kiosk sales. In exchange, Happay would provide a wide array of technical services, including "ensur[ing] that the Avanti Software and the Avanti Portal meet all specifications and operational requirements for PCI Compliance." PCI compliance entails meeting security standards set by the payment card industry to conduct online transactions. The SLA also provided that Happay could not assign its duties without Avanti's prior written consent and that if it wished to use independent contractors, it had to provide reasonably detailed information about the contractors to Avanti.

Brinton testified that he permitted Avanti to enter the SLA because he knew he was an owner of Happay. However, without his knowledge, on September 28, 2016, Leeks and Williams executed corporate documentation for Happay that listed themselves as the sole shareholders, governors, and board members. They did not tell Brinton that they had changed their mind about Happay's structure. Indeed, Brinton testified that at a transition meeting with the Byndl team with Williams and Leeks, he introduced himself as a majority owner of the new company. Similarly, at a meeting with the Boxspy team, Brinton again introduced himself as a majority owner of Happay in the presence of Williams and Leeks. Williams and Leeks did not correct him at either meeting.

3

On September 30, 2016, Williams submitted documents to Brinton to provide a personal guarantee for Happay office space. Believing that he was a majority owner of Happay, Brinton agreed to do so. Brinton continued to act based on his belief that he was a majority owner, including by providing advanced payments to front the Happay payroll, directing Avanti's controller to make regular payments to Happay in addition to what was required under the SLA, and e-mailing Williams in March 2017 asking about the status of his K-1 tax form as "'a large stakeholder.'"[1] In response to this last inquiry, Williams simply stated, "'[R]egarding taxes, [a]s a C-Corp, Happay does not distribute K-1 to 'owners.' C-Corps provide 1099-DIV for dividends paid to individuals/entities who own their stock during a calendar year.'"

In January 2017, four months into the SLA, Happay informed Avanti that it could not keep up with the work it had undertaken under the SLA. Williams proposed that Avanti increase funding to Happay by approximately $3.4 million, thereby enabling Happay to hire additional full-time employees and 19 full-time independent contractors. He proposed that Happay would hire independent contractors and bill Avanti "at-cost," and that he and Leeks would "identify third-party providers for price, capacity and quality," and negotiate pricing from there. Brinton agreed to the proposal, and the parties entered the "Happay, Inc. Consulting Agreement" (Consulting Agreement) on February 6, 2017. The Consulting Agreement permitted Avanti to assign projects to Happay and be

---

[1] Happay protests that it did not accept these funds as investments, but instead used them to offset what it was owed under the SLA. However, they do not appear to have informed Brinton of this fact.

billed for those projects at a rate that allowed Happay to hire contractors but did not specifically include an "at-cost" provision.

Around the same time, without informing Avanti, Williams and Leeks formed Wexos Partners LLC, an entity through which they planned to obtain the independent contractors. Williams and Leeks used the name of one of their employees as the sole governor of Wexos in Wexos's foreign registration statement with the Washington Secretary of State's Office. The employee, whom the court found to be more credible than Williams and Leeks, denied having anything to do with the submission and denied being a governor of Wexos. Wexos then entered an agreement with a software company in India to secure third party contractors for Happay. Wexos billed Happay, which in turn passed these costs on to Avanti, at a substantially higher rate for these contractors than Wexos paid: Happay ultimately billed Avanti $1,757,292.50 for the same services for which Wexos paid only $280,440.00. Wexos then paid Williams and Leeks $75,000.00 salaries, which they received on top of their Happay income. Despite its obligation under the SLA and despite repeated requests, Happay did not report to Avanti when, how, or who it recruited under the Consulting Agreement. Avanti did not discover that Leeks and Williams owned Wexos or that Wexos had inflated these costs until the litigation at issue.

Meanwhile, Happay was struggling to meet its PCI compliance goals. In July 2016, when Leeks was still working for Boxspy as Byndl's head of engineering, Leeks had been involved in seeking a deadline extension and suspension of fines for Avanti's PCI compliance status, representing that Avanti

could achieve PCI compliance by mid-February 2017. Bank of America Merchant Services (BAMS) granted this extension until February 2017. In February, five months into the SLA and as an officer of Happay, Leeks submitted another request to BAMS for an extension and further suspension of fines. BAMS granted the extension to December 1, 2017, but began imposing fines at a rate of $10,000 per month on March 1, 2017. On October 31, 2017, Leeks told Reilly that, "[a]s it currently stands, the overall [PCI] compliance level is 2.08 [percent]."

Concerned that Happay was not making progress, Avanti hired a consulting firm, Coalfire, to perform an investigation and evaluation of Happay PCI progress. Avanti had previously hired Coalfire for auditing, which was separate from this remediation work. Avanti's president, John Reilly, testified that Avanti paid Coalfire $240,000 specifically for this work resulting from Happay's underperformance.

Reilly explained that, by the fall of 2017, it was clear that Happay would not achieve its PCI goals, and it decided to hire Attunix to take over this work for Happay. Attunix achieved PCI compliance by March 2018, at a cost of $180,000.

On September 6, 2017, in response to an e-mail from Brinton, Williams and Leeks for the first time informed Brinton that he owned no interest in Happay. On October 10, Happay delivered a one-year notice to terminate the SLA to Avanti. The parties later agreed to terminate the SLA at the end of November 2017. The transition did not go smoothly, as Happay failed to provide Avanti's team with access codes and passwords in a timely manner.

Avanti and Brinton sued Happay for breach of the SLA, among other claims, and Williams and Leeks for fraud based on their representation that Brinton was a majority owner of Happay. Happay countersued and alleged breach of contract for underpayments. After a bench trial, the court found that Happay had breached the SLA by failing to ensure the Avanti software met operational requirements for PCI compliance, and the court awarded damages for the BAMS fines, Coalfire costs, and Attunix costs. The court also found that Happay breached the SLA by failing to provide Avanti with information about its independent contractors and by violating the duty of good faith and fair dealing in its surreptitious use of Wexos to inflate contractor costs. Accordingly, it awarded damages for the "overcharge" effectuated by Wexos. It also found that Williams and Leeks committed fraud against Brinton and awarded Brinton damages for his personal guarantee of the lease, which Happay had broken. It offset these damages by $200,000 for a separate underpayment by Avanti. It imposed these damages, as well as attorney fees, jointly and severally against Happay, Williams, and Leeks. Happay, Williams, and Leeks appeal.

ANALYSIS

The appellants contend that the trial court erred by finding that Happay breached the SLA with respect to PCI compliance and billing for its contractors, by finding that Leeks and Williams committed fraud against Brinton, and by imposing joint and several liability against Happay, Leeks, and Williams. We disagree and affirm.

Standard of Review

When a party challenges a trial court's findings of fact and conclusions of law, we "limit our review to determining whether substantial evidence supports the findings and whether those findings, in turn, support its legal conclusions." Scott's Excavating Vancouver, LLC v. Winlock Props., LLC, 176 Wn. App. 335, 341, 308 P.3d 791 (2013). Substantial evidence is evidence that is sufficient to persuade a rational fair-minded person that the finding is true. Scott's Excavating, 176 Wn. App. at 341-42. "This is a deferential standard, which views reasonable inferences in the light most favorable to the prevailing party." Scott's Excavating, 176 Wn. App. at 342. We review conclusions of law de novo. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

PCI Compliance

Happay contends that the trial court erred by concluding that Happay breached the SLA and awarding damages for Happay's failure to achieve PCI compliance. We conclude that the court appropriately determined that Happay breached the contract when it failed to ensure that the Avanti software met "all specifications and operational requirements for PCI compliance." Furthermore, because uncontroverted evidence establishes that Happay's breach caused Avanti to incur additional costs, we conclude that the court appropriately awarded damages.

1. Breach of Contract

The trial court concluded that "Happay materially breached the SLA in failing to deliver performance in accordance with section 1.4.1(e) of the SLA by

8

failing to ensure that the Avanti Software and Avanti Portal met all specifications and operational requirements for PCI compliance." Happay contends that this was error because the SLA did not set a completion deadline for Happay to meet the operational requirements for PCI compliance. Because the court should determine a reasonable time for performance when the contract does not state a time, and the court appropriately did so here, we disagree.

"Where a contract is silent as to duration or states time for performance in general and indefinite terms, the court is to impose a reasonable time." Pepper & Tanner, Inc. v. Kedo, Inc., 13 Wn. App. 433, 435, 535 P.2d 857 (1975). "A reasonable time is to be determined by the nature of the contract, the positions of the parties, their intent, and the circumstances surrounding performance." Pepper, 13 Wn. App. at 435. The court's determination of reasonable time is a question of fact, Smith v. Smith, 4 Wn. App. 608, 612, 484 P.2d 409 (1971), which we review for substantial evidence as described above. "When an implicit finding can be inferred from the record . . . , this court generally can review the finding." State v. Sisouvanh, 175 Wn.2d 607, 618, 290 P.3d 942 (2012).

Here, the trial court found that in the summer of 2016, "Leeks was directly involved in Avanti seeking and receiving an extension of a BAMS[ ] deadline for PCI compliance . . . . Accordingly, when the SLA was executed on September 1, 2016, Leeks was aware of the mid-February PCI compliance deadline, because he was the person who had requested it." The court then imposed damages for the fines that Avanti began incurring after its failure to meet the February deadline. We infer that the court determined that the February deadline was a

9

reasonable time limit for Happay to meet its contractual PCI obligations. Furthermore, the court's findings are supported by the record, which shows that Leeks requested and was aware of the February deadline before entering the SLA. Therefore, we affirm the court's conclusion that Happay breached the SLA when it failed to ensure that the Avanti software met "all specifications and operational requirements for PCI compliance."

### 2. Causation for PCI Damages

The trial court next awarded damages for three costs Avanti incurred due to "Happay's failure to achieve PCI compliance." Specifically, the court awarded Avanti damages for (1) $130,000 in PCI noncompliance fines to BAMS, (2) $180,000 in costs for PCI compliance work to Attunix, and (3) $238,467 for Coalfire's PCI compliance-related work. Happay contends that these damages were not proximately caused by Happay's failure to achieve the specifications and operational requirements for PCI compliance and that the court improperly imposed a larger duty on Happay than the SLA provided for. Because the record supports the court's conclusion that Happay's breach caused Avanti to incur these costs, we affirm.

The trial court must enter findings "on all material issues" to inform the appellate court what questions it decided and how it decided them. Fed. Signal Corp. v. Safety Factors, Inc., 125 Wn.2d 413, 422, 886 P.2d 172 (1994). However, a trial court "need not enter written findings as to facts that were undisputed at trial." Herring v. Pelayo, 198 Wn. App. 828, 834, 397 P.3d 125 (2017). When the record includes conflicting evidence regarding a material issue

and the trial court does not enter findings on this issue, "an adequate review requires a remand for entry of findings of fact which show an understanding of the conflicting contentions and evidence as well as a knowledge of the standards applicable to the determination." Fed. Signal, 125 Wn.2d at 423.

First, Happay challenges the court's award of damages for the BAMS fines assessed against Avanti for its PCI noncompliance. Happay contends that it was not responsible for these fines because the fines had previously been suspended and the deadline deferred, and in February 2017 BAMS declined to grant a further suspension. This contention is without merit: while an injured party should not recover damages that it could have avoided through reasonable efforts, Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, 840, 100 P.3d 791 (2004), Happay cites no law suggesting that an injured party should not recover damages because a third party could have chosen to not impose costs that it had the right to impose.

Happay also contends that its breach did not cause the BAMS fines because achieving PCI compliance involved several nontechnical tasks that were not Happay's responsibility under the SLA. It points to evidence of these PCI requirements in the record, including establishing policies and procedures, providing security training, and performing physical checks of kiosks. However, all the evidence indicates that Avanti's PCI noncompliance was caused by its failure to meet the specifications and operational requirements which were, in fact, Happay's responsibility. Leeks acknowledged that when he sent a letter to BAMS asking for an extension and indicating that Byndl would be rolling out a

11

technical solution by mid-February 2017, this indicated to BAMS that Avanti would achieve PCI compliance by mid-February 2017. After Avanti took away PCI work from Happay, Attunix, which was also a software company, fully achieved PCI compliance for Avanti. It did so by doing operational work including building a new environment for the software, backing it up, and managing passwords and controls. Furthermore, Reilly's testimony at trial was that the BAMS fines were a result of Happay's performance. The court's finding attributing the BAMS fines to "Happay's failure to achieve PCI compliance" muddies the issue because it does not acknowledge the other nontechnical requirements of PCI compliance; however, the record clearly indicates that Avanti's PCI noncompliance was due to a failure to achieve operational requirements that were Happay's responsibility. Because there is no evidence to the contrary, the trial court's failure to enter a finding specifically to this effect is not fatal, and we affirm the trial court's award of damages for the BAMS fines as stemming from Happay's breach.

Similarly, Happay contends that the Coalfire and Attunix costs paid by Avanti went toward aspects of PCI compliance that were beyond the scope of Happay's duties under the SLA. Happay contends that these costs included aspects of PCI compliance that it alleges were outside the scope of its duties, including providing auditing, disaster recovery, and system backup services. However, again, the record clearly indicates that this is not the case. Reilly identified these costs as being specifically attributable to Happay's performance, and explained that Coalfire's auditing work was separate from the work it did to

12

compensate for Happay's failure to achieve PCI compliance. Leeks's own admission indicated that if Byndl had succeeded at its technical goals, Avanti would reach PCI compliance. Again, because the evidence only indicated that Avanti incurred these costs to compensate for Happay's failures under the SLA, we affirm the trial court's award of these damages.

Overcharge for Wexos Contractors

Happay next challenges the trial court's conclusion that Happay breached the SLA by using Wexos to obfuscate and inflate the cost of its contractors. Specifically, Happay claims that the court erred by relying on the Consulting Agreement and extraneous information to find a breach of contract. Because the trial court appropriately concluded that Happay breached the SLA by failing to provide information about the contractors and by violating the duty of good faith and fair dealing, we disagree.

"There is in every contract an implied duty of good faith and fair dealing," which "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). While "the duty arises only in connection with terms agreed to by the parties," Badgett, 116 Wn.2d at 569, "'[i]t is, of course, possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract.'" Rekhter v. Dep't of Soc. & Health Servs., 180 Wn.2d 102, 111, 323 P.3d 1036 (2014) (quoting Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 766 (7th Cir. 2010)). "The duty of good faith requires 'faithfulness to an agreed common purpose and consistency with the justified expectations of the

13

other party.'" Edmonson v. Popchoi, 172 Wn.2d 272, 280, 256 P.3d 1223 (2011) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981)).

Here, the trial court concluded that Happay's actions in hiring outside contractors breached the SLA in two ways. First, it concluded that Happay "materially breached the SLA by failing and refusing to deliver to Avanti details about the identities, backgrounds, credentials and professional employment histories" of the contractors "as required under Paragraph 12" of the SLA. Paragraph 12 prohibited Happay from assigning any of its performance obligations to third parties without Avanti's written consent and stated that if Happay hired independent contractors, Happay "shall identify the services to be performed by such independent contractor and provide reasonably detailed information about the expertise and employment history of such individual to Avanti. Avanti may approve or disapprove the use of such independent contractor but shall not disapprove them unreasonably." The record supports the trial court's conclusion that Happay breached this provision by repeatedly refusing to provide information about the contractors, and Happay makes no argument on appeal to the contrary. Accordingly, we uphold the court's conclusion that Happay breached this portion of the contract.

Second, the court concluded that

Happay materially breached its implied covenant of good faith and fair dealing under the SLA when it agreed that it would engage the services of independent contractor software developers "at-cost," but instead withheld from Avanti its intent to obtain those services at a particular cost and then significantly inflate that cost for billing to Avanti through Wexos, a new and separate entity that Williams and Leeks secretly created for their own pecuniary benefit.

Happay provides virtually no argument against the court's characterization of these facts, but instead argues that the court erred in its findings by discussing a breach of the Consulting Agreement and extrinsic information when Avanti had only alleged a breach of the SLA. However, although one of the court's findings mentions a breach of the Consulting Agreement, the trial court did not rely on the Consulting Agreement to conclude that Happay breached its duty of good faith. The SLA required Happay to receive Avanti's consent before hiring outside contractors and gave Avanti authority to reject the use of contractors. Testimony at trial established that Avanti gave this permission on the basis of Happay's representation that the contractors would be provided "at cost." The evidence that Happay proposed an at-cost pricing model to secure Avanti's permission to hire contractors under the SLA and then secretly used a new entity to inflate its costs supports the court's determination that Happay violated its duty of good faith and fair dealing under the SLA.

Finally, the trial court's award of damages for the overcharge follows from its conclusions about the breach of the SLA. While Happay objects that there was no overcharge because the SLA did not contain an "at cost" provision, the record establishes that Avanti would not have permitted the use of consultants if it had known about the cost inflation. The fact that it did not know about the cost inflation stemmed from the breaches that the trial court appropriately identified. Accordingly, the trial court did not err by imposing these damages.

15

Fraud Claim Against Williams and Leeks

Williams and Leeks claim that the trial court erred in finding that they defrauded Brinton into believing that he was the majority owner of Happay and that therefore the award of damages for Brinton's personal guarantee of Happay's lease was error. We disagree and conclude that the court's finding is supported by substantial evidence.

To establish fraud, a plaintiff must establish: "(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." Stiley v. Block, 130 Wn.2d 486, 505, 925 P.2d 194 (1996). The plaintiff must establish these elements by clear, cogent, and convincing evidence. Stiley, 130 Wn.2d at 505.

The appellants first challenge whether there was a representation of an existing fact. On this point, the trial court found that Brinton, Williams, and Leeks orally agreed that they would co-own Happay, that Brinton would own 65 percent of its shares, and that he would make substantial investments in Happay in addition to causing Avanti to enter into the SLA with Happay. The court then concluded that Williams and Leeks had falsely represented to Brinton that they agreed to this ownership structure and that when they later failed to disclose that they had made themselves the sole owners, this was equivalent to an affirmative representation to the contrary.

Williams and Leeks contend that there was no representation of an *existing* fact because any agreement concerned the *future* ownership of Happay, which did not yet exist at the time of the agreement. They are correct that as a general rule, fraud cannot be predicated on "a statement as to future performance." Shook v. Scott, 56 Wn.2d 351, 355, 353 P.2d 431 (1960). However, where "a promise is made for the purpose of deceiving and with no intention to perform," it can support an action for fraud. Markov v. ABC Transfer & Storage Co., 76 Wn.2d 388, 396, 457 P.2d 535 (1969); see also RESTATEMENT (SECOND) OF TORTS, § 530 ("A representation of the maker's own intention to do or not do a particular thing is fraudulent if he does not have that intention."). Here, the court found that Williams and Leeks purposefully concealed their exclusion of Brinton from Happay and took many actions to maintain his belief that he was a majority owner. The record indicates that their promise was made for the purpose of deceiving Brinton in order to enter into the SLA, and therefore, substantial evidence supports the court's finding of a misrepresentation of an existing fact.[2]

---

[2] Williams and Leeks spend much of their brief contending that the record did not establish any consideration or sufficiently definite terms, including whether Brinton or Avanti would be the majority owner, to demonstrate the existence of a contract. However, we need not determine whether a binding contract existed to uphold the court's finding that there was a material misrepresentation of fact. Even so, Brinton's testimony established that the parties agreed he would be a majority owner in exchange for, among other things, allowing Happay to enter into a lucrative deal centered around Avanti's proprietary software. This constitutes substantial evidence supporting the existence of an oral agreement and consideration. While Brinton expressed doubt at one point about whether he or Avanti was supposed to be the majority owner, the majority of Brinton's testimony and e-mails between the parties indicates that the parties did indeed agree Brinton would be the majority owner.

The other element of fraud challenged by the appellants is the court's determination that Brinton had a reasonable belief that he was Happay's majority owner when he guaranteed the lease. They contend that as a sophisticated businessman, he could not reasonably rely on an oral representation to this effect. However, the cases they cite do not support this proposition: the first is a dissent stating that a title insurance company has an independent duty to make a competent search of the record title, Lawyers Title Ins. Corp. v. Baik, 147 Wn.2d 536, 559, 55 P.3d 619 (2002) (Sanders, J., dissenting),[3] and the second concerned a case where a party relied on "oral representations [that] directly contradicted the written terms" of a loan, Cornerstone Equip. Leasing, Inc. v. MacLeod, 159 Wn. App. 899, 906, 247 P.3d 790 (2011). Here, the parties did not enter a written agreement, let alone one that contradicted the terms of their oral agreement. Viewing the facts in the light most favorable to Brinton, and given the oral agreement of the parties and Leeks and Williams' acquiescence to Brinton's public representations that he was a majority owner of Happay, substantial evidence supports the court's finding that Brinton reasonably relied on the appellants' misrepresentation in guaranteeing Happay's lease. Because the elements of fraud were established by clear, cogent, and convincing evidence, we affirm the trial court's award of damages attributable to Brinton's guarantee of the lease based on this fraud.

---

[3] The appellants did not disclose that this citation was to a dissent.

18

Joint and Several Liability

The appellants next contend that the court erred by imposing joint and several liability against Happay, Williams, and Leeks. We are not persuaded by their assertion.

"When the shareholders of a corporation, who are also the corporation's officers and directors, conscientiously keep the affairs of the corporation separate from their personal affairs, and no fraud or manifest injustice is perpetrated upon third persons who deal with the corporation, the corporation's separate entity should be respected." Frigidaire Sales Corp. v. Union Props., Inc., 88 Wn.2d 400, 405, 562 P.2d 244 (1977). "Typically, the injustice which dictates a piercing of the corporate veil is one involving fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit." Truckweld Equip. Co. v. Olson, 26 Wn. App. 638, 644-45, 618 P.2d 1017 (1980). "The question of whether the corporate form should be disregarded is a question of fact" that is reviewed for substantial evidence. McCombs Const., Inc. v. Barnes, 32 Wn. App. 70, 76, 645 P.2d 1131 (1982).

Here the court found and the record establishes that the "representation of majority ownership was . . . material to Brinton's willingness to authorize Avanti to enter into the SLA." Accordingly, we conclude that Brinton authorized Avanti to enter the SLA with Happay because of fraud on the part of Happay's stockholders. Therefore, this is a situation in which the trial court could reasonably find that the corporate veil should be pierced, and we affirm the court's finding.

The appellants disagree and contend that because there was only a fraud claim against Leeks and Williams, and not against Happay, piercing the corporate veil was inappropriate. The appellants cite no case supporting the proposition that fraud must be pleaded against a corporation to support piercing the corporate veil. Even so, this argument misses the point. The court found that Avanti entered the SLA with Happay because of fraud on the part of Happay's owners. This is therefore a case in which piercing the corporate veil is appropriate.

Attorney Fees

The appellants challenge the trial court's imposition of attorney fees, including on the issue of fraud, against Happay, Leeks, and Williams. We affirm the award of attorney fees and grant Avanti and Brinton attorney fees on appeal.

While attorney fees may be awarded where authorized by a contract, they are normally not awarded for tort actions. Pearson v. Schubach, 52 Wn. App. 716, 723, 763 P.2d 834 (1988). However, "[i]f a tort action is based on a contract central to the dispute that includes an attorney fee provision, the prevailing party may receive attorney fees." Stieneke v. Russi, 145 Wn. App. 544, 571, 190 P.3d 60 (2008). Fraud claims are "on the contract" where a party enters the contract in reliance on a fraudulent representation. See Stieneke, 145 Wn. App. at 553, 571 (fraud claim was on the contract where parties had relied on false assurances that roof did not leak when purchasing home). Here, the fraud claim was on the SLA, which provided that, "[i]n the event of a dispute arising out of this Agreement, the party substantially prevailing in the resolution thereof shall be

entitled to recover" reasonable attorney fees. Thus, we affirm the court's award of attorney fees on both the contract and fraud claims.

Furthermore, "[a] party is entitled to attorney fees on appeal if a contract, statute, or recognized ground of equity permits recovery of attorney fees at trial and the party is the substantially prevailing party." Hwang v. McMahill, 103 Wn. App. 945, 954, 15 P.3d 172 (2000). Because the contract provides a basis for attorney fees and Avanti and Brinton substantially prevail on appeal, they are also entitled to recover attorney fees on appeal subject to their compliance with RAP 18.1(d).

We affirm.

WE CONCUR: